Filing # 64610415 E-Filed 11/27/2017 03:11:24 PM

IN THE CIRCUIT COURT FOR THE 15TH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

CARTER A. POTTASH,

    Plaintiff,

v.

ABILITY, INC.; BENJAMIN GORDON; and JONATHAN MORRIS, in his capacity as trustee of the GORDON FAMILY 2007 TRUST,

    Defendants.

_____/

CASE NO.: 502016CA013823XXXXMB AG

## SECOND AMENDED COMPLAINT

The Plaintiff, Dr. Carter A. Pottash, sues Ability, Inc., Benjamin Gordon, and Jonathan Morris, in his official capacity as Trustee of the Gordon Family 2007 Trust, and states as follows:

### Overview

1.    This is a securities case. As set forth below, the Defendants, through a series of misrepresentations and omissions, induced Plaintiff to invest in the stock of a publicly-traded company, first known as Cambridge Capital Acquisition Corporation, then known as Cambridge Holdco Corp., and finally known as Ability, Inc. Plaintiff has lost more than $1.1 million due to Defendants' conduct.

### Parties, Jurisdiction, and Venue

2.    Dr. Carter A. Pottash is a physician and a resident of Palm Beach County, Florida.

3.    Defendant Ability, Inc. ("Ability") is the public company whose stock was fraudulently sold to Plaintiff and other victims. This company was originally formed by

NOT A CERTIFIED COPY

Defendant Gordon and others in 2013 as a Delaware corporation under the name "Cambridge Capital Acquisition Corporation." From the date of its formation up to December 23, 2015, this company had its principal place of business in Palm Beach County, Florida.

4.      On December 23, 2015, Cambridge Capital Acquisition Corporation effected a business combination agreement with an Israeli company, Ability Computer & Software Industries, Ltd. ("ACSI"). Cambridge Capital Acquisition Corporation first merged into one of its wholly-owned subsidiaries, "Cambridge Holdco Corp.," a Cayman Islands corporation, with Cambridge Holdco Corp. surviving the merger.

5.      Cambridge Holdco Corp. then immediately acquired a majority ownership of the Israeli company, ACSI, in exchange for a combination of stock and cash. At that point, the company changed its name from Cambridge Holdco Corp. to "Ability, Inc."

6.      The surviving entity, Ability, Inc., is incorporated in the Cayman Islands with its principle place of business in Tel Aviv, Israel. The stock of Ability, Inc. trades publicly on the NASDAQ under the ticker symbol "ABIL." Ability, Inc. claims to provide telephone interception and cyber-intelligence tools for military and law enforcement agencies and foreign governments.

7.      As the surviving entity of the merger between Cambridge Capital Acquisition Corp. and Cambridge Holdco Corp., which took place on December 23, 2015, Ability, Inc. is liable for all actions committed by its predecessor companies as well as the agents, officers and directors of these predecessor companies.

8.      Defendant Benjamin Gordon is a licensed stockbroker and stock promoter who lives and works in Palm Beach County, Florida. As set forth below, Gordon solicited Plaintiff to invest in the stock of a publicly traded company that changed its name throughout the course of

this case, first from "Cambridge Capital Acquisition Corporation" to "Cambridge Holdco Corp.," and then to "Ability, Inc." Gordon served as a Director of this company at all relevant times, regardless of its various name changes. He also served as the Chief Executive Officer of Cambridge Capital Acquisition Corporation, and served as a "promoter" of this company with a large volume of insider shares.

9.      Defendant Jonathan Morris is the Trustee of the Gordon Family 2007 Trust (hereafter "the Family Trust"). Morris lives and works in Dallas, Texas. The Family Trust served as a "promoter" of the public company according to documents filed with the SEC, and it held a large volume of insider shares. At all material times, Defendant Gordon, with the assistance of Defendant Morris, utilized the Family Trust as a vehicle to sell and promote the stock of the public company. In particular, Defendant Morris allowed Gordon to control the assets of the Family Trust and to give insider shares owned by the Family Trust as a "bonus" to induce potential investor victims to invest in the public company. Morris also allowed Gordon to sign agreements evidencing Gordon's control of the Family Trust, despite Morris' putative role as Trustee of the Family Trust. Morris asserts that the Family Trust's situs is in Texas, though the settlors of the Family Trust are Gordon and his wife, who are both residents of Florida. In addition, the Family Trust represented to the SEC in a 2016 filing that its business and mailing addresses were in Palm Beach County, Florida.

10.     This Court has personal jurisdiction over Ability, Inc. pursuant to sections 48.193(1)(a)1., 48.193(1)(a)2., 48.193(1)(a)6.a., and 48.193(2), Florida Statutes. Ability, Inc.'s predecessor-in-interest, Cambridge Capital Acquisition Corp., maintained its principal place of business in Florida through December 23, 2015, meaning that it operated, conducted, engaged in, or carried on a business or business venture in this state or had an office or agency in this state.

Moreover, Ability, Inc., through the various predecessor companies and their agents and co-conspirators (as alleged herein), committed tortious acts within the State of Florida, namely, the misrepresentations, omissions, and fraudulent acts described below. Ability, Inc., through the various predecessor companies and their agents, caused injury to Plaintiff during a time that they were also engaged in solicitation within the State of Florida, namely, solicitation for the sale of stock of the public company, as further described below.

11.     Finally, the predecessor companies of Ability, Inc. were engaged in substantial and not isolated activity within this state through Gordon and other agents, up until the time of the business combination described below, which was effected on December 23, 2015.

12.     Ability, Inc. and its predecessor companies had numerous other officers and directors who may have participated in the frauds outlined below. Plaintiff reserves the right to add these additional Defendants at a later time.

13.     This Court has personal jurisdiction over Morris and the Family Trust pursuant to section 48.193(1)(a)2., Florida Statutes. Morris, on behalf of the Family Trust, committed tortious acts within the State of Florida through his participation in a conspiracy to commit fraud against Pottash, who is a Florida resident. In addition to having the ultimate aim of harming Florida residents, members of the conspiracy, including Gordon, committed acts in Florida in furtherance of that conspiracy, as set forth in this Complaint.

14.     The Court may exercise jurisdiction over this case because the amount in controversy exceeds $15,000 exclusive of interest, costs, and fees.

15.     Venue is proper in this Court because at least one Defendant resides in and does business in Palm Beach County and because the causes of action alleged in this Complaint accrued in Palm Beach County.

**Factual Allegations**

*Gordon Persuades Plaintiff to Invest in the SPAC*

16.     In 2013, Gordon and others formed a special purpose acquisition company called the Cambridge Capital Acquisition Corporation (hereafter "Cambridge SPAC" or "SPAC").  A SPAC is a publicly-traded buyout company that raises money in order to acquire a target private company.  Once the target company is acquired, the target company becomes a publicly-traded company.

17.     Gordon served as the Chief Executive Officer, Secretary, Treasurer, and Director of the Cambridge SPAC.  According to the SPAC Prospectus,[1] he and the Family Trust were also "promoters" and "insiders" as those terms are defined under federal securities laws.

18.     Gordon held a great deal of stock in the SPAC, including 60,483 shares held in his own name and 1,582,413 shares held in the name of the Family Trust, acquired at the price of a penny per share.  According to the SPAC Prospectus, Gordon was entitled to exercise "no control" over the shares held in the Family Trust.  Instead, those shares were under the control of a Trustee, Jonathan Morris, who had "voting and dispositive power" over the shares.

19.     Beginning in September 2013, in conversations that took place in Palm Beach County, Gordon began soliciting Dr. Pottash to invest in the soon-to-be-formed SPAC by making a number of representations, including that Gordon had consistently made great sums of money for his investors in prior transactions.  In an email dated September 20, 2013, Gordon claimed that he had experience with three "supply chain companies," and that "we've done 4 deals in 3 years, and had 3 liquidity events already—all at big numbers. . ."  Gordon also wrote that these liquidity events "resulted in 5x, 10x, and 13x cash on cash returns."  In conversations

---

[1] Pursuant to Fla. R. Civ. P. 1.130(a), Plaintiff hereby incorporates the Cambridge Capital Acquisition Corporation Prospectus, dated December 17, 2013, *available at* https://www.sec.gov/Archives/edgar/data/1588869/ 000121390013007303/ d30991.htm (hereafter the "SPAC Prospectus"), into this Complaint.

around this time, Gordon also told Dr. Pottash that these were his own transactions, that he directed and controlled them, and that his investors always made "big numbers."

20.     At the time of the above representations, Dr. Pottash trusted Gordon and believed him to be competent and honest.  Dr. Pottash believed and reasonably relied upon the statements in paragraph 19.

21.     In reality, Gordon's track record was mixed.  For instance, in or around 2012, Gordon had been a mere investor – not a founder or sponsor – in two technology companies called PCP Hi-Tec Holdings, LLC and PCP Applied Holdings, LLC.  In 2012, the true sponsor of these investments, Poinciana Capital Partners, LLC, sued Gordon in Florida state court to force Gordon to withdraw his money because Gordon had breached his contractual obligations to the true sponsor.  *See Poinciana Capital Partners, LLC v. Gordon*, et al, 50-2012-CA-21072 (Fla. 15th Cir. Ct.).

22.     In another instance, in or around 1999, Gordon founded an online logistics company called 3Plex.com.  Allegedly, Gordon helped the company raise approximately $28 million in capital.  However, he left the company before it was sold and had little to do with the transaction.

23.     Based on Gordon's representations, however, in or around December 2013, Dr. Pottash decided to invest $1 million into the Cambridge SPAC.  Dr. Pottash invested the money by way of a wire transfer to an account that Gordon instructed him to open at EarlyBird Capital, Inc., an advisor to the SPAC and an investment bank that focuses on special purpose acquisition companies.

24.     In exchange for his investment, Dr. Pottash received 100,000 shares of the Cambridge SPAC, with a ticker symbol of "CAMBU."

*SPAC Terms & Restrictions*

29.     The SPAC Prospectus contained a number of significant provisions, including the following:

A.      The SPAC had a deadline of June 23, 2015, to accomplish a merger transaction with a target company.   This deadline had only one exception, namely, if a "definitive agreement" were to be signed on or before June 23, 2015 with a target company, the closing deadline could be extended to December 23, 2015.

B.      In the event no merger transaction took place by the target deadline, the SPAC would be liquidated and all investor monies returned.

C.      Moreover, once a target company was identified, Plaintiff and other investors had the option to convert his SPAC shares to cash, thereby receiving a full refund of his investment.  This option gave investors the right to back out of the deal if, for any reason, they did not like the proposed merger transaction.

D.      Gordon had the ability to loan money to the SPAC, but these loans would be repaid to him *only* if a target merger transaction took place.

E.      Gordon had the ability to incur expenses in pursuit of a transaction, but these expenses would be reimbursed to him *only* if a target merger transaction took place.

F.      In the event no transaction took place, under certain circumstances, the promoters (essentially Gordon and the Family Trust) would become personally liable for expenses incurred on behalf of the SPAC.

NOT A CERTIFIED COPY

G.      Also, in the event no transaction took place, promoters such as Gordon and the

Family Trust would lose the ability to sell the SPAC stock they had acquired for

themselves at very low prices, as low as a penny per share.

*Gordon Fails to Find a Transportation/Logistics Company*

30.     Over the next eighteen months, Gordon searched for a target transportation or

logistics company to acquire.  Despite the expertise he professed to have in this area, he proved

unsuccessful in closing a transaction.

31.     On or about December 1, 2014, the SPAC executed a preliminary merger

agreement with Parakou Tanker, Inc., a company engaged in the shipping business.

32.     Following announcement of the merger, however, the SPAC and its Directors

were sued by a shareholder, who brought a derivative action, alleging the proposed transaction

was not in the best interests of the company, *Levy v. Gordon, et al.*, Case No.  2015-CA-003339

(Fla. 15th Cir. Ct.).  The shareholder alleged, among other things, that the SPAC had agreed to

over-pay for the target company and that Gordon and the other Directors had placed their own

financial interests ahead of the shareholders.

33.     Following this lawsuit, the SPAC released additional information to investors

about the proposed deal, after which the deal failed.  Gordon and the SPAC abandoned the

Parakou deal on or about May 6, 2015.

34.     Following the demise of the Parakou deal, Gordon and the SPAC had less than

two months to satisfy the June 23, 2015 deadline for signing a "definitive agreement" for a

merger transaction, which would thereby extend the deadline to December 23, 2015, to

consummate a merger transaction.

NOT A CERTIFIED COPY

35.     With these deadlines looming, Gordon faced the following economic consequences should he fail to close a transaction:

A.      He had incurred expenses (believed to be in excess of $100,000 by this time), which would not be reimbursed absent a closed transaction.

B.      He had made approximately $350,000 in loans to the SPAC, through his entity Cambridge Capital, LLC, which would not be repaid absent a closed transaction.

C.      He owned 60,483 shares of common stock in the SPAC, acquired at a penny per share, but now worth over $600,000 based on the trading price as of June 23, 2015. These shares would become worthless absent a closed transaction.

D.      The Family Trust owned 1,582,413 shares of common stock in the SPAC, acquired at a penny per share, but now worth over $15.8 million based on the trading price as of June 23, 2015. These shares would become worthless absent a closed transaction.

36.     Facing these economic realities, in May 2015, Gordon began frantically searching for another company to acquire. He quickly dispensed with his original plan to acquire a transportation or logistics company and instead began to search for any company at all.

37.     In the process, Gordon and the SPAC missed the June 23, 2015 deadline to enter into a "definitive agreement" for a merger, sufficient to extend the closing deadline to December 23, 2015. Under the terms of the SPAC, Gordon should have liquidated the SPAC and returned all investor money at that point in time.

38.     However, Gordon failed to comply with the SPAC's governing documents and return the investors' money. Instead, Gordon continued to advise Plaintiff that he was actively searching for another acquisition target, all the while ignoring the fact that he had already missed

9

the deadline to sign a definitive agreement.  Gordon assured Plaintiff that the deadline had been extended by virtue of the Parakou deal, even though the transaction had been terminated.

39.     Gordon effected a *de facto* change to the terms and conditions of the SPAC, without Plaintiff's knowledge or approval, by extending his deadline to December 23, 2015, even though he had no "definitive agreement" in place for the target company.  Had Gordon advised Plaintiff of the true state of affairs, Plaintiff would have demanded the return of his investment.

40.     By moving forward in violation of the SPAC terms, moreover, Gordon put himself in an impossible situation.  He did not have adequate time to investigate new targets, to do extensive and adequate due diligence, or to negotiate good terms on behalf of his investors.  Most importantly, Gordon was burdened by a severe lack of leverage in any negotiations with target companies.

### Gordon Finds ACSI– an Israeli Technology Company

41.     In or around August 2015, Gordon advised Plaintiff that he had located Ability Computer & Software Industries, Ltd. ("ACSI") as a target company.  ACSI was founded and owned by two former Israeli military intelligence officers, and the company was allegedly involved in telephone interception technology.

42.     Dr. Pottash immediately pointed out that this target company was not a transportation or logistics company, as contemplated by the SPAC terms, and that he felt uneasy keeping a million dollars invested in an area where Gordon lacked expertise.  In other words, Dr. Pottash was inclined to exercise his right to convert his SPAC shares for cash rather than proceed with a technology deal headed by someone who had no special expertise in that field, namely, Gordon.

43.     Gordon thereafter made a series of misrepresentations to Dr. Pottash designed to induce him to keep his money in the deal.  Gordon did this by misrepresenting his own expertise in technology companies and by misrepresenting the overall merits of the ACSI transaction.  Given Dr. Pottash's concern, such misrepresentations were material and critically deceitful.

44.     On August 31, 2015, for example, Gordon emailed Dr. Pottash, claiming that he was "working on a cybersecurity deal that is doing $30 million of net income. . . ."  This number was false.  In May 2016, Ability, Inc. would restate its financials to show that, in reality, ACSI had a negative net income in 2013 (roughly -$280,000), only $3.1 million of net income in 2014, and only $14.8 million of net income in 2015.

45.     At the time Gordon made the statement in paragraph 44, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later became Ability.

46.     At the time of the above statement, Dr. Pottash trusted Gordon and believed him to be competent and honest.  Dr. Pottash believed and reasonably relied upon the statement in paragraph 44.  Moreover, Gordon knew or should have known that the statement was false.

47.     When Dr. Pottash voiced continued skepticism at Gordon's lack of experience and expertise in technology and cybersecurity, Gordon emailed Dr. Pottash on August 31, 2015, claiming that he had "founded and built and sold t[w]o technology companies."

48.     At the time Gordon made the statement in paragraph 47, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later become Ability.

49.     At the time of the above statement, Dr. Pottash trusted Gordon and believed him to be competent and honest.  Dr. Pottash believed and reasonably relied upon the statement in paragraph 47.

50.     Gordon knew the statement in paragraph 47 was false and misleading at the time he made it.  In reality, he had not "founded, built, and sold" any technology companies.

51.     On September 8, 2015, the Cambridge SPAC issued a joint press release with ACSI announcing a proposed plan of merger to be consummated by December 22, 2015 (on the eve of the SPAC's final deadline).[2]

52.     The September 8, 2015 press release claimed:

Ability's revenues for the six months ended June 30, 2015 rose 162% to $43.0 million from $16.4 million for the comparable period in 2014. During this same period, net income rose at a faster rate, up 394% to $16.8 million from $3.4 million.

Plaintiff reviewed and reasonably relied upon this press release.

53.     The statements in paragraph 52 were made by the Cambridge SPAC, a company that later become Ability, Inc.  Moreover, Gordon forwarded the press release to Plaintiff soon after it was issued, evidencing his adoption of the statement for himself.

54.     The numbers set forth in paragraph 52 were false.  The Cambridge SPAC (later to become Ability, Inc.), and Gordon knew or should have known the numbers were false at the time this statement was made.  In later SEC filings, Ability, Inc. revealed that, in fact, ACSI had revenues of only $41.2 million and net income of only $12.3 million in the first six months of 2015.

55.     In the September 8, 2015 press release, the Cambridge SPAC (later to become Ability, Inc.) explained the value of the merger as follows:

We are excited to partner with Ability. We believe Ability stands out as a leader in providing differentiated solutions in lawful interception and decryption of cellular and satellite communications. The company is led by a talented team of

_____

[2] Pursuant to Fla. R. Civ. P. 1.130(a), Plaintiff hereby incorporates this press release, available at http://www.businesswire.com/news/home/20150908005579/en/Cambridge-Capital-Acquisition-Corporation-Merge-Ability-Computers (hereafter the "September 8, 2015 press release"), into this Complaint.

professionals and employs an asset-light business model that supports strong free cash flow potential and high margins.

Ability has established a reputation in the market, based on management's in-depth understanding of its customers' intelligence needs and a dedication to the quality, reliability, and ease-of-use of its solutions. We look forward to contributing our business and financial expertise to assist Ability in reaching its growth goals.

56.     The press release also set forth an impressive list of activities for ACSI:

Ability's installed customer base spans five continents and over 50 countries, and its broad range of solutions are utilized by governments, security agencies and law enforcement worldwide.

Ability's primary areas of activity include:

- o   Cellular interception, including passive and active solutions for GSM, CDMA, UMTS and LTE networks

- o   Satellite communication interception, including Thuraya, Iridium and VSAT

- o   Cyber solutions for smartphones and computers

- o   Customized solutions for specific customer needs

- o   Geographic-based solutions for cellular location

Key products currently under development or recently launched include:

- o   LTE cellular interception solution

- o   Crime prevention system

- o   Detector of interception systems

Ability operates in large, growing markets for global homeland security and cyber security markets. According to Renaissance Strategic Advisors, the global homeland security market is estimated to be $148 billion in 2015, and projected to grow at a 6% CAGR from 2015 to 2020. Homeland security spending includes intelligence community spending, federal and local law enforcement spending, and government investment into cyber technologies. Ability also participates in the global commercial cybersecurity market, which is estimated to be $93 billion in 2015 and projected to grow at a 17% CAGR from 2015 to 2020. Finally, Ability's primary lawful interception global target market is estimated to be $6

13

billion and is projected to grow at an 11% CAGR from 2015 to 2020. Key factors driving this growth include a rise in terrorism, illegal immigration, and smuggling of drugs, firearms and goods, among other security threats.

57.     On November 18, 2015, Gordon and ACSI's Israeli president, Anatoly Hurgin, participated in a conference call for investors, the transcript of which the Cambridge SPAC filed with the SEC[3] and which Plaintiff read and relied upon.

58.     During the call, Ben Gordon and Hurgin touted a revolutionary new product that supposedly belonged to ACSI, called "ULIN."   According to Hurgin, ULIN was a new technology that made interception possible from any location:

> Unlike tactical interception system[s], we do not need to be in the vicinity of a target to be able to intercept our target.  Unlike strategic interception systems, you don't need to be connected to network [calculators] and you do not need any calculations [unintelligible word] network calculators.

59.     Hurgin stated that "it's the future of interception systems."  Hurgin also boasted that "**we are Ability the only owner for this technology**. . . .  We are going to go to sale of our software based system and in 2016, 2017 it will be up to 50% of our sales."  (Emphasis added).

60.     These representations regarding ULIN, a supposedly revolutionary technology, were material to Plaintiff.  Most importantly, the statement in paragraph 59 regarding ACSI's ownership of ULIN was material to Plaintiff.

61.     Unfortunately, the statement in paragraph 59 was false.  ACSI did not own the ULIN technology at all, but merely held a three-year license to resell it.  Well after their investments had been made, Plaintiff discovered that ACSI had signed a licensing agreement with the true owner of the ULIN technology in October 2015 – meaning that the statements made

---

[3] Pursuant to Fla. R. Civ. P. 1.130(a), Plaintiff hereby incorporates this transcript, available at https://www.sec.gov/Archives/edgar/data/1588869/000121390015008887/f425111815_cambridgehold.htm into this Complaint.

on the investor conference call with Gordon and Hurgin on November 18, 2015, about owning ULIN were outright lies.

62.     Hurgin made the statement in paragraph 59 on behalf of ACSI, a company later merged into Ability, Inc.  Likewise, the Cambridge SPAC (later to become Ability, Inc.) adopted and re-published the statement by filing the transcript of the call with the SEC, so that investors could review and rely upon the statement.  Ben Gordon, a participant in the call, likewise adopted the statement by participating in the call and failing to correct the obvious misrepresentation regarding ownership of ULIN.  Gordon also repeated the assertion that Ability owned ULIN to Plaintiff on multiple occasions.

63.     Hurgin, on behalf of ACSI (later to become Ability, Inc.), the Cambridge SPAC (later to become Ability, Inc.), and Gordon knew or should have known that the statement in paragraph 59 was false at the time it was made.

64.     On November 22, 2015, Gordon emailed Dr. Pottash a "pitch book" regarding the proposed merger with ACSI.  In the body of the email, Gordon claimed "[ACSI] has built a pipeline of $148m of business . . ."

65.     At the time Gordon made the statements in paragraph 64, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later become Ability.

66.     Plaintiff believed and reasonably relied upon the statements in paragraph 64 and in the pitch book in making his decision as to whether to approve the merger between the SPAC and ACSI.

67.     Unbeknownst to the Plaintiff, the representation about a $148 million "pipeline" was false.  As revealed by later SEC filings, ACSI actually *lost money* in the very quarter in

which Gordon made this statement.  Moreover, in contrast to an existing "pipeline" of business, Ability, Inc.'s revenue fell in 2016 and the company lost over $8 million for the year.

68.     Gordon emailed the "pitch book" to Plaintiff on November 22, 2015 and again on or about December 19, 2015.  Gordon sent the pitch book on behalf of himself and on behalf of the Cambridge SPAC (a company that later become Ability, Inc.).

69.     The pitch book contained numerous other representations that also later proved to be false and misleading, including:

A.     Gordon had completed "two successful technology company exits."  (p. 4)

B.     ACSI had "create[d]" the ULIN technology. (p. 18)

C.     ACSI had a "large and growing pipeline" of business worth $148,306,875. (p. 19)

D.     ACSI's pipeline of business included nine separate customers. (p. 19)

E.     ACSI had a $1.7 million "PO imminent" in the Middle East.  (p. 19)

F.     ACSI had the ULIN technology, which was "unique to Ability – no known competitors" and "developed in house." (p. 20)

Plaintiff reviewed and relied upon the pitch book.

70.     As to paragraph 69A, Gordon, on behalf of himself, and the Cambridge SPAC (a company that would later become Ability, Inc.) knew the statement was false and misleading at the time he sent it to Plaintiff.  As set forth in paragraphs 21-22, Gordon's past experience in technology companies was limited and not successful.

71.     As to paragraph 69B and 69F, Gordon, on behalf of himself and the Cambridge SPAC (a company that would later become Ability, Inc.) knew or should have known the statement was false.  As set forth in paragraph 61, ACSI did not own the ULIN technology.

72.     As to paragraph 69D, Gordon, on behalf of himself and the Cambridge SPAC (a company that would later become Ability, Inc.) knew or should have known the statement was false.  In truth, 68% of ACSI's revenues were concentrated in only one customer.

73.     As to paragraph 69C and 69E, Gordon, on behalf of himself and the Cambridge SPAC (a company that would later become Ability, Inc.) knew or should have known the statement was false.  As set forth in later SEC filings, Ability, Inc.'s revenues declined sharply the very next year and – far from having an existing pipeline of business – the company actually lost money in 2016.  A P.O. in the Middle East has yet to materialize.

74.     The pitch book also claimed that the merger would result in a company with "High Management Ownership 62% - 2 Year Lock Up."  Gordon likewise repeatedly told Plaintiff in or around December 2015 the sellers at ACSI were "on the hook" and "had skin in the game" to make sure the company succeeded.

75.     At the time Gordon made the statements in paragraphs 74, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later become Ability.

76.     Plaintiff believed and reasonably relied upon the statements in paragraph 74.

77.     Gordon, on behalf of himself, and the Cambridge SPAC (a company that would later become Ability, Inc.), knew or should have known the statements in paragraph 74 were false.  In truth, the two owners of ACSI, Anatoly Hurgin and Alexander Aurovski, had negotiated a one-sided, sweetheart deal with the Cambridge SPAC (no doubt due to Gordon's utter lack of leverage as he faced the looming SPAC deadline, of which the ACSI owners were no doubt aware).

78.     In addition to stock in Ability, Inc., the two ACSI owners received $18.15 million in cash at closing, as well as the right to declare an immediate $11 million dividend for

themselves, which was equal to all of ACSI's cash on hand prior to the closing.  In addition, the two owners received a put option, giving them the right to sell 1,173,267 shares back to the company at $10.10 per share on or before February 21, 2018.  This put option was fully secured by a cash escrow account in excess of $11.8 million.

79.     Far from having "skin in the game," therefore, the two ACSI owners were guaranteed over $41.5 million in cash no matter what happened, even if the company failed.  Moreover, they still retained majority control of the new company.

80.     On November 25, 2015, Gordon emailed Dr. Pottash again, on behalf of himself and the Cambridge SPAC (a company that later became Ability, Inc.) repeating the bogus claim that the company had an existing "pipeline of $148M." This representation was again false.

81.     On December 2, 2015, the Cambridge SPAC filed a prospectus and proxy statement (the "Proxy/Prospectus") with the SEC relating to the proposed combination with ACSI.[4]

82.     The Proxy/Prospectus invited SPAC investors to vote to approve the transaction at a special meeting to be held on December 22, 2015.  Under the terms of the SPAC, of course, investors also had the option to convert their shares to cash and pull out of the deal.

83.     The Proxy/Prospectus contained numerous misrepresentations and omissions.  For example, the Proxy/Prospectus falsely referred to the ULIN technology as "our ULIN," "introduced November 2015," despite ACSI's lack of ownership.

84.     Also, the Proxy/Prospectus claimed that all relevant "agreements, contracts and commitments," "liabilities," as well as "relationships" had been disclosed to investors.  This was false because:

---

[4] Pursuant to Fla. R. Civ. P. 1.130(a), Plaintiff hereby incorporates the Proxy/Prospectus, dated December 2, 2015, available at https://www.sec.gov/Archives/edgar/data/1652866/000119312515392954/d18083d424b3.htm into this Complaint.

A.   ACSI owed significant liabilities to a third party for commissions on the sale of certain products. These liabilities were not disclosed in the Proxy/Prospectus.

B.   ACSI did not own the ULIN technology. Instead, ACSI had entered into an October 20, 2015 Reseller Agreement with the true owner of the technology, allowing a limited time to sell the product as a reseller. This Reseller Agreement was not disclosed in the Proxy/Prospectus.

C.   The Reseller Agreement imposed significant liabilities upon ACSI and required ACSI to pay up to $4.1 million in fees to the true owner of the technology, *even if no ULIN sales were made.* This liability was not disclosed in the Proxy/Prospectus.

85.   The Proxy/Prospectus also laid out certain financial data relating to the entities to be merged, including the following ACSI income statement and balance sheet:

Statement of Income Data:

| | For the nine months ended September 30. | | For the year ended December 31. | |
|---|---|---|---|---|
| | 2015 | 2014 | 2014 | 2013 |
| | (unaudited) | | | |
| Revenues | $51,689 | $20,680 | $22,134 | $5,588 |
| Cost of revenues | 27,609 | 12,797 | 14,654 | 4,455 |
| Gross profit | 24,080 | 7,883 | 7,480 | 1,133 |
| Sales and marketing expenses | 2,420 | 2,323 | 2,387 | 665 |
| General and administrative expenses | 1,058 | 302 | 469 | 419 |
| Operating income | 20,602 | 5,258 | 4,624 | 49 |
| Finance expenses (income), net | 42 | (75) | (269) | 371 |
| Income (loss) before income taxes | 20,560 | 5,333 | 4,893 | (322) |
| Income taxes expenses (benefit) | 3,277 | 1,357 | 1,260 | (53) |
| Net and comprehensive income (loss) | 17,283 | 3,976 | 3,633 | (269) |

Balance Sheet Data:

| | As of September 30, 2015 (unaudited) | As of December 31, 2014 |
|---|---|---|
| Cash | $ 16,011 | $ 10,794 |
| Total Current Assets | 26,520 | 13,698 |
| Total Assets | 27,470 | 14,455 |
| Total Current Liabilities | 13,545 | 11,720 |
| Total Non-Current Liabilities | 415 | 257 |
| Total Liabilities | 13,960 | 11,977 |
| Total Shareholders' Equity | 13,510 | 2,478 |

86.     These numbers would later be shown to be false when, in May 2016, Ability, Inc. restated its financials.  Among other inaccuracies, ACSI's true revenue for the first nine months of 2015 was only $50.2 million, and its true net income over the same time was only $15.1 million.

87.     The Proxy/Prospectus also falsely boosted Gordon's alleged expertise in technology.  In an earlier filing with the SEC in March 2015, the SPAC had described Gordon's biography as follows:

> Mr. Gordon is a recognized expert on the supply chain sector, and has been quoted extensively by national media including CNBC, The New York Times, Business Week, ABC, Lehrer News Hour, Journal of Commerce, Transport Topics, Supply Chain Management Quarterly and Traffic World. Mr. Gordon has been a featured speaker at the Council of Supply Chain Management Professionals (CSCMP), NASSTRAC, the Transportation Intermediaries Association (TIA), AMB, the International Warehousing and Logistics Association (IWLA), and other industry events.

88.     Less than nine months later in the December Proxy/Prospectus, Gordon and the SPAC added three false words to this biography, but left the balance of the paragraph, which related to supply chain experience, unaltered, as if to falsely state that it actually showed technology experience:

> Mr. Gordon is a recognized expert **on technology and** on the supply chain sector, and has been quoted extensively by national media including CNBC, The New York Times, Business Week, ABC, Lehrer News Hour, Journal of Commerce, Transport Topics, Supply Chain Management Quarterly and Traffic World. Mr. Gordon has been a featured speaker at the Council of Supply Chain Management Professionals (CSCMP), NASSTRAC, the Transportation Intermediaries Association (TIA), AMB, the International Warehousing and Logistics Association (IWLA), and other industry events.

(Emphasis added).  This alteration was false and misleading.  Gordon had no special expertise in the technology sector, and on information and belief, none of the media outlets mentioned had ever quoted him as an expert on technology issues.

89.    In addition, the Proxy/Prospectus falsely claimed a huge "backlog" of projects for which purchase orders had already been signed:

> According to [ACSI's] management, it has a backlog (comprised of signed purchase orders) of $65.7 million in projects around the globe, of which 80% are with Latin American clients.  The backlog is expected to generate over 40% gross margin in H2–2015.  According to management, the backlog includes only projects in progress that are planned to be completed through 2015–2016 and excludes later phases of projects that are planned for later than 2016.

90.    In reality, ACSI did not have a backlog of signed purchase orders for $65.7 million of work around the globe.   To the contrary, revenues fell off the cliff the next year, and the company lost over $8 million.  The total revenues for the final quarter of 2015 were only $2.0 million, and for 2016, revenues amounted to only $16.5 million.

91.    The Proxy/Prospectus statements above were made by the Cambridge SPAC, a company that later become Ability, Inc.  Moreover, Gordon forwarded the Proxy/Prospectus to Plaintiff soon after it was issued, thereby adopting the statement for himself.

92.    The statements in paragraphs 83-89 were false and the omissions in paragraphs 83-89 were material, in that the omitted information would have altered Plaintiff's investing

decision. The Cambridge SPAC (later to become Ability, Inc.), and Gordon knew or should have known the above statements were and the omissions were material at the time they were made.

93.     Plaintiff reviewed the Proxy/Prospectus.  The misrepresentations and omissions described above were material to the Plaintiff and he reasonably relied upon these misrepresentations and omission in making his investing decisions.

94.     In December 2015, Gordon also emailed to Plaintiff a research report that had been prepared by Mallku Capital Management.   The report contains numerous misrepresentations about ACSI's finances that had been provided to Mallku Capital Management by Gordon, acting for himself and as an agent of the Cambridge SPAC (later to become Ability, Inc.).

95.     Among other misrepresentations, the report claimed the following about the existing "pipeline" of business and concentration of customers:

> In addition, from the pipeline shown, there are two potential new customers with large contracts of up to $20 million in value. We also note that 56% of the pipeline is in Asia, further diversifying away from that big Latin American client.

96.     In reality, ACSI's sales were not diversified.  To the contrary, sales were severely over-concentrated with nearly 68% of its revenue coming from only one customer.  This highly material fact was never disclosed to Plaintiff.

97.     The misleading information in paragraphs 95-96 was supplied to Mallku by the Cambridge SPAC, a company that later became Ability, Inc.  Indeed, the Mallku report indicates that researchers met with Gordon personally several times.  Moreover, Gordon forwarded the misleading research report to Plaintiff soon after it was issued, thereby adopting the statements for himself.

98.     The statements in paragraph 95-96 were false and misleading and failed to reveal the over-concentration of sales.  The Cambridge SPAC (later to become Ability, Inc.), and Gordon, knew or should have known the above statements were false and the omissions were material at the time they were made.

99.     Plaintiff reviewed the Mallku research report.  The misrepresentations and omissions described above were material to Plaintiff and he reasonably relied upon these misrepresentations and omissions in making his investing decision.

### *Plaintiff Elects to Keep His Money in the SPAC*

100.    At Gordon's urging, in or around mid-December 2015, Plaintiff elected not to exercise his right to convert the SPAC shares into cash, which would have resulted in a refund of his investments.  Instead, he voted in favor of the ACSI transaction.

101.    Dr. Pottash made his decision to keep his SPAC shares and to vote for the transaction, in justifiable reliance on the numerous misrepresentations and omissions made to him, including those set forth in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, and 94-96.  Had Dr. Pottash known the facts that would be revealed in the upcoming months, he would have converted his shares and obtained a refund of his money.

102.    Plaintiff's December 2015 decision not to convert his shares into cash represented a new investment decision, separate and apart from his December 2013 decision to buy the shares in the first place.  Plaintiff had the contractual right to bow out of the investment, but he chose not to do so because he was in the dark regarding the fraud being perpetrated against him.

### *Gordon Solicits Plaintiff to Invest Additional Funds*

103.    As the December 23, 2015 deadline to approve the transaction approached, Gordon became frantic that he would not have enough capital to close the deal.  As set forth

earlier, if the deal failed to close, Gordon would lose significant sums of money.  Gordon began to call Plaintiff asking him to recruit other investors and to invest more money himself into the deal.

104.    On December 19, 2015, Gordon sent yet another email to Dr. Pottash in Palm Beach County, claiming, "The technology and pipeline is significantly stronger now than it was when we signed the merger agreement."

105.    At the time Gordon made the statements in paragraph 104, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later become Ability.

106.    At the time of the above representations, Plaintiff believed and reasonably relied upon the statements in paragraph 104.

107.    The Cambridge SPAC (later to become Ability, Inc.), and Gordon knew or should have known the above statements were false and the omissions were material at the time they were made.  There was no $148 million pipeline, let alone a "stronger" pipeline; in fact, as later results would show, at this point, ACSI's sales volume had already been collapsing, and the company lost money in 2016 and, upon information and belief, is continuing to lose money.

### *Gordon Claims that Multi-Billionaire Jeff Greene is Investing in the Deal*

108.    As part of his ongoing effort to solicit Dr. Pottash to invest more money into the deal, Gordon also claimed, in mid-December 2015, that Jeff Greene, a prominent Palm Beach multi-billionaire investor (and apparently Gordon's best friend) had decided to invest in the SPAC/ACSI merger.  This was a crucial representation because Dr. Pottash trusted Greene's investing judgment and also trusted that Gordon would never steer Greene into a questionable deal, given their close friendship.

109.    Dr. Pottash made it very clear to Gordon that he would not invest additional monies unless Greene was also investing, and in a significant amount.  When Dr. Pottash asked how much Greene was investing, Gordon responded by email on December 17, 2015 - only a few days before the deadline for the deal – that Greene was not investing directly, but rather through a technology fund at J.P. Morgan in which Greene held a substantial stake in excess of $50 million: "Jeff is planning to invest through a tech fund at JP Morgan, in which he is already a $50m investor."  Gordon further repeated these fraudulent statements in voicemails left for Dr. Pottash.

110.    The next day, Gordon emailed Dr. Pottash that, "JP Morgan just committed $15m, and invested 10m at 355pm." Gordon called and emailed Dr. Pottash, in Palm Beach County, repeatedly and frantically around the time of this email, pushing him to invest more money. Gordon repeatedly told Dr. Pottash that Jeff Greene was also investing and had significant personal exposure.

111.    When that alone did not seem to move Dr. Pottash, on or about December 19, 2015, Jeff Greene himself texted Plaintiff, claiming, "Btw, I'm going into Ben's deal."  Dr. Pottash immediately texted back to Greene, asking, "Through JP Morgan fund or additionally direct?"  Greene replied, "**I'm investing $7.5 in addition to JPM's $10 million…**" (Emphasis added).  This was a crucial representation to Dr. Pottash, which was, unfortunately, false.

112.    On information and belief, Gordon recruited Jeff Greene to send these texts to Dr. Pottash to help convince him to invest more money.  As it was later revealed, Jeff Greene, an investor with far more sophistication than Dr. Pottash, did not invest in the deal, either directly or through a J.P. Morgan technology fund, regardless of his personal friendship with Gordon.

113.    On the evening of December 20, 2015, with the deadline only days away, Dr. Pottash emailed Gordon asking to see the actual signed agreement whereby the J.P. Morgan technology fund, which allegedly held so much of Jeff Greene's money, had agreed to invest in the deal.  Gordon replied, "Sure thing. Please see attached."

114.    The attached document showed that two J.P. Morgan funds had indeed agreed to invest in the deal, one investing 99% of the funds, which Plaintiff presumed to be the technology fund holding Jeff Greene's money, and another fund investing 1% of the funds, both signed by a JP Morgan Executive Director.  On the face of the document, it was not obvious to Dr. Pottash that the funds may not be related to Greene.

115.    At the time Gordon made the statements in paragraphs 108-114, he acted on behalf of himself and on behalf of the Cambridge SPAC, a company that later become Ability.

116.    Dr. Pottash reasonably replied upon the representations in paragraphs 108-114.

117.    Gordon, acting on behalf of himself, and on behalf of the Cambridge SPAC (a company that later become Ability), knew that the representation in paragraphs 108-114 were false and misleading.

118.    As later events proved, Greene invested nothing in the SPAC/ACSI deal, either personally or through any technology fund.  The two J.P. Morgan funds that agreed to invest in the deal had *nothing* to do with Jeff Greene.  Instead, 99% of the investment came from a fund that held monies owned by a governmental department (the social security administration) of the People's Republic of China.

119.    Gordon was well aware and Dr. Pottash had made clear, over and over again, that Dr. Pottash would not invest more money into the deal unless Jeff Greene — Gordon's supposed best friend — had significant exposure.  As it turned out, Greene wanted nothing to do with the

deal, despite his personal friendship with Gordon.  This would have been a huge red flag to Dr. Pottash and a game changer.   Gordon knew the importance of this factor to Dr. Pottash and deliberately kept up the ruse that Greene was investing in the deal, in order to deceive and mislead him.

### *Gordon Loots Family Trust Stock to Induce Additional Investors*

120.   In addition to the "Jeff Greene is investing" story, Gordon employed another scheme to induce investors as the December 23 deadline approached.   Specifically, Gordon began to dip into the "piggy bank" of stock owned by the Family Trust (1,582,413 shares) and to give away these shares in order to find a way to close the transaction.   Thus, Gordon promised multiple investors that, if they agreed to invest in the deal, he would personally transfer additional "bonus" stock from the Family Trust into their names, for free.

121.   According to documents filed with the SEC, Gordon had no authority to make these promises.  In the December 2015 Proxy/Prospectus, for example, Gordon had advised the SEC that he had "no control" over the Family Trust shares.  Instead, that control was held by Defendant Jonathan Morris, who as Trustee of the Family Trust, exercised "voting and dispositive power" over the shares.   The SPAC's Form 10K for the year ending December 31, 2014, had likewise claimed that "Mr. Morris . . . exercises voting and dispositive power over the shares held by [the Family Trust]."   Also, the Family Trust shares were supposed to be under a restriction that prohibited any sale "until the second anniversary of the closing."

122.   Despite all of this, Gordon began to offer free chunks of Family Trust stock (with no restrictions on their resale) to potential investors.  Gordon offered different deals for "bonus" stock to different investors.  Some investors received a 10% "bonus," while others received a 40% "bonus."  As an example, an investor who invested $5 million in the ACSI deal might

receive an additional $2 million worth of "bonus" stock for free, thereby receiving a total number of shares worth $7 million.

123.    On December 20, 2015, Gordon offered Dr. Pottash a 40% deal.  In other words, if Dr. Pottash invested an additional $5 million, he would get $2 million worth of "bonus" stock from the Family Trust.  Gordon emailed Dr. Pottash the documents necessary to effectuate this transfer, explaining: "Deal docs below. 2m free from _me_…" (Emphasis added).

124.    The documents that Gordon emailed to the Plaintiff to effectuate the "bonus" transfer contained a signature block for the Gordon Family Trust to sign, but identified Gordon, not Trustee Jonathan Morris, as the authorized signatory.  Plaintiff never spoke to Morris and had no idea who he was.

125.    Based on the above events, Gordon used the Family Trust as a tool in the conspiracy to sell and solicit the SPAC stock by means of misrepresentations and omissions.

126.    As Trustee of the Family Trust, Jonathan Morris owed a fiduciary responsibility to protect the assets of the Family Trust and to formally approve any transfer to third parties. The Family Trust transferred "bonus" stock to numerous investor victims, including to Plaintiff. Morris may have given permission to Gordon to transfer this stock ahead of time, but in any event, he ratified these transfers after the fact.  Either way, he knowingly allowed the Family Trust to be used as part of the conspiracy to sell SPAC stock to Plaintiff and others.

*Plaintiff Invests Additional Sums Into the Transaction*

127.    On December 21, 2015, Dr. Pottash agreed to make an additional investment into the transaction.   Dr. Pottash made his decision, in justifiable reliance on the numerous misrepresentations and omissions made to him, including those set forth in paragraphs 19, 44,

47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104, and 108-114.  Had Dr. Pottash known the facts that would be revealed in the upcoming months, he would not have invested additional funds.

128.    Dr. Pottash wired $5 million into a J.P. Morgan account at Gordon's instruction. Dr. Pottash believed this money would be used to purchase $5 million more of the stock of the SPAC, soon to be merged into Cambridge Holdco Corp., then renamed "Ability, Inc."  In addition, he believed that $2 million more in "bonus" stock would immediately be transferred to him from the Family Trust, as Gordon promised in writing.

### *Gordon's Perverse Incentives to Close the Transaction*

129.    Gordon and the other Defendants operated under immense conflicts of interest, resulting in a series of perverse incentives to close the SPAC/ACSI deal at any cost.  If the transaction failed to close, Gordon would have suffered the following economic consequences:

A.    Gordon had incurred expenses of at least $268,000 on behalf of the SPAC, which would not have been reimbursed absent a closed transaction.

B.    Gordon had previously been reimbursed for $425,178 in expenses, which he would have been required to refund absent a closed transaction.

C.    Gordon had made approximately $350,000 in loans to the SPAC, through his entity Cambridge Capital, LLC, which would not have been repaid absent a closed transaction.

D.    The SPAC had incurred $7.8 million in additional expenses.  Under certain circumstances, Gordon could have become personally liable for some or all of these expenses in the event no transaction took place.

E.    Gordon owned 60,483 shares of common stock in the SPAC, acquired at a penny per share, but worth over $609,000 based on the NASDAQ trading price on

November 24, 2015. These shares would become worthless absent a closed transaction.

F. The Gordon Family 2007 Trust owned 1,582,413 shares of common stock in the SPAC, acquired at a penny per share, but worth almost $16 million based on the NASDAQ trading price as of November 24, 2015. These shares would become worthless absent a closed transaction.

G. Gordon stood to make Director fees in excess of $60,000 per year with the company, which he would have lost absent a closed transaction.

H. Gordon would be spared the very public personal and professional embarrassment of failing to succeed in his first large business transaction after two years of efforts.

130. Due to these perverse incentives, Gordon and the other Defendants misled Plaintiff and other investors in order to assure that the SPAC/ACSI deal closed.

131. The other Directors of the SPAC – Mitchell I. Gordon, Michael J. Durham, Nathan Gantcher, and Scott B. Laurans – likewise operated under severe conflicts of interest and had perverse incentives to approve the deal at any cost. Like Gordon, these Directors owned large sums of SPAC stock that would have become worthless had the deal not closed, and they had personally indemnified the SPAC for certain expense liabilities in the event the transaction did not close. These additional Directors have not been named as Defendants at this time, but Plaintiff reserves the right to add them in the future for aiding and abetting Gordon's conduct as described above.

132.     Defendants made many of the above misrepresentations and omissions to multiple other investors, as well as to prospective investors who later chose not to invest.  A number of these third parties are known to Plaintiff and will corroborate the allegations of this Complaint.

### The SPAC/ACSI Transaction Closes

133.     On December 23, 2015, the SPAC/ACSI transaction closed.  As a result of the transaction, the Cambridge SPAC merged into one of its wholly-owned subsidiaries, "Cambridge Holdco Corp.," which survived the merger as a new entity, incorporated in the Cayman Islands.  Next, Cambridge Holdco, Corp. immediately acquired 100% of the outstanding shares of ACSI, at which point the company changed its name to "Ability, Inc."

134.     Following the transaction, the company's shares began trading on the NASDAQ under the symbol "ABIL" on December 24, 2015.  The price per share was $10, plus a warrant per share valued at $0.10 per warrant.

135.     Soon after the closing, Gordon contacted Dr. Pottash to advise that, despite his earlier fears, he had raised enough capital to close the transaction after all, and he therefore was issuing Dr. Pottash a partial refund of the additional $5 million that he had solicited Dr. Pottash to invest only days before.  Gordon did this because it was in his personal financial interest to do so, as he had found a better deal—other investors willing to invest without the 40% "bonus" shares he had offered to Dr. Pottash.  (Of course, Gordon planned to take back a pro-rata portion of the "bonus" shares as part of the refund.)  Dr. Pottash agreed to a refund of $4 million, which did not arrive until around two weeks later.  In total, Dr. Pottash invested approximately $2 million.

136.     In addition to the 100,000 shares and 100,000 warrants he had previously purchased, Dr. Pottash received 94,594 additional shares on or about December 21, 2015, and

37,838 "bonus shares" far later, on or about May 11, 2016.  In total, he received 132,432 shares, plus 100,000 warrants, between December 2013 and May 2016.

### *Excessive Expenses Paid to Gordon*

137.    Under the original SPAC documents, Gordon was eligible to submit a claim for reimbursement of certain expenses if the transaction closed before December 23, 2015.  In documents filed with the SEC, Gordon claimed these expenses to be $268,169 as of November 24, 2015.   Less than one month later, however, Gordon claimed the SPAC had incurred $7.8 million in expenses (over and above $2 million in additional transaction costs), according to documents later filed with the SEC.

138.    After the closing, Dr. Pottash questioned this amount and asked Gordon for an accounting.  Gordon refused to provide an answer.  Dr. Pottash was concerned, because Gordon had done extensive and expensive entertaining at his home in Palm Beach, had sent lavish gifts of caviar and champagne to prospective investors and friends, and was rumored to use large private jets when traveling.  In addition, the sums Gordon spent on various consultants, advisors, and bankers seemed redundant, extraordinary in size, and grossly inappropriate.

139.    Despite Dr. Pottash's repeated formal and informal requests, Gordon refused to provide explanation or back-up for the $7.8 million in expenditures.

### *Ability Announces a Restatement of its Financials*

140.    On February 16, 2016, Ability, Inc. issued a press release announcing that it would release its "fourth quarter and full-year 2015 financial results before the market opens on March 3, 2016."

141.    Thereafter, on March 2, 2016, Ability, Inc. issued another press release announcing that it needed to postpone the release of its fourth quarter and full-year 2015

financial results "until such time that the audit of our financial results is complete."  As an apparent result, the stock price of Ability began to drop significantly.

142.    On May 2, 2016, the company then filed its annual report with the SEC on Form 20–F.  In it, the company disclosed that it had restated its consolidated financial statements as of December 31, 2014, for 2013 and 2014:

> Our consolidated financial statements as of December 31, 2014 and for the two years in the period then ended have been restated to reflect correction of errors with respect to **previously unrecognized commissions due to a vendor** on revenues that were recognized in 2014, 2013 and 2012; **improper allocation and timing of revenue recognition** from connection to supportive infrastructure in multiple element sale transactions recognized in 2014, 2013 and 2012; and **previously unrecognized commissions due to a third party** on cost of revenues that were recognized in 2014. . . .

(Emphasis added).

143.    In another part of the Form 20-F, the company explained the need to restate the financial statements as follows:

> As part of our financial reporting closing process, material weaknesses in our internal control over financial reporting were identified with respect to cut-off procedures relating to expenses, as certain amounts due to two third parties had not been timely expensed, and revenue recognition in multiple element sale transactions had not been properly allocated and timely deferred, which resulted in a restatement of the consolidated financial statements as of December 31, 2014 and for the two years in the period then ended and as of June 30 and September 30 in 2015 and 2014 and for the six and nine month periods then ended, respectively. . . . Further, it was discovered that certain amounts were outstanding as of December 31, 2015, which could be deemed a violation of Section 402 of the Sarbanes-Oxley Act of 2002. The outstanding balance has been repaid in full by the Ability shareholders. Further, in 2015, Ability was a victim of fraud committed by an outside, unrelated third party resulting in an unauthorized outgoing transfer of $0.5 million. We intend to address our internal control over financial reporting issues in order to remedy these material weaknesses.

144.    The restatement demonstrates that Defendants' previous representations regarding ACSI's income, revenue and financial statements had been materially false and misleading

because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

A.  that ACSI had materially overstated its income by failing to account for commissions;

B.  that ACSI had materially overstated its operating results by improperly recognizing revenue on multiple element sale transactions;

C.  that ACSI had materially overstated its income by failing to account for commissions due to a third party;

D.  that ACSI had material weakness in its internal controls over financial reporting and disclosure controls, and that such controls were ineffective; and

E.  as a result of the foregoing, ACSI's financial statements for the years ending December 31, 2013 and 2014 were materially false and misleading and not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

145.  SEC Regulation S-X, codified at 17 C.F.R. § 210.4-01(a)(1) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Interim financial statements must likewise comply with GAAP. 17 C.F.R. § 210.10-01(a).  By announcing that it intended to restate its financial statements and informing investors not to rely on the prior financial statements, Ability, Inc. admitted that the statements were false and misleading when originally issued.

146.  On news of the Restatement, the company's stock price plummeted.

*Plaintiff Learns About Gordon's Repeated Misrepresentations*

147.   The Restatement showed that prior representations regarding ACSI's revenue, income and other financial statements were patently false.   Instead of a company with a net income of over $30 million, ACSI had a negative net income in 2013 (roughly -$280,000), and only a $3.1 million net income in 2014.   The net income in 2015, while larger, was only $14.8 million.

148.   On May 10, 2016, Gordon, who at the time was on the Board of Directors of Ability, Inc., wrote an email to certain investors, including to Plaintiff, admitting that Ability, Inc. recorded "no revenue" for the fourth quarter of 2015.   This was an extraordinary admission. During the same time period that Gordon had begged Plaintiff and others to invest, and after making representations of a "$148 million pipeline," and "$65.7 million backlog of signed purchase orders," there were in fact "**no revenues**" in the very quarter in which the transaction had closed.

149.   In addition, in the May 2, 2016, Form 20-F filed by Ability, Inc., the company for the first time disclosed that **it did not own the ULIN technology!**   As set forth in the disclosure:

> **All our ULIN sales are based on a reseller agreement granting us a worldwide exclusive right to sell ULIN, which automatically terminates in October 2018** and may be terminated by either party under certain specific circumstances. . . .  **The owner of ULIN is an unrelated third party supplier** and, as such, we have no ability to exert any influence over the business or employees of the supplier.

(Emphasis added.)

150.   In another section of the Form 20-F, the company disclosed the details of the "reseller agreement" for the first time, to Plaintiff's shock:

> **On October 20, 2015**, we entered into an agreement with a third party supplier who designs and licenses the ULIN products. This agreement may in the future account for a significant portion of our vendor costs . . . as well as a significant part of our revenues . . . . According to the agreement, **the supplier (an unrelated company) granted Ability an exclusive and non-transferable right and license**

> **to market, promote, advertise, sell and distribute its products**, none of which are sold or marketed under the supplier's trademark, directly to customers worldwide **in consideration for 50% of Ability's net income relating to those sales. . . The agreement has a three year term** and may be terminated by a party in case of the other party's material breach, bankruptcy, insolvency, creditor assignment, liquidation, receivership or loss of control of all or substantially all of its business.

(Emphasis added.)  Thus, when Gordon and the other Defendants represented to Plaintiff that Ability "owned" ULIN and developed it "in house" back in November and December 2015, those representations had been false.  The Agreement also called for a penalty if Ability failed to sell enough ULIN— a previously hidden contingent liability now suddenly carried on the books for $4.1 million.

151.   As a promoter of the deal, Gordon owed a duty to conduct extensive and exhaustive due diligence prior to recommending the SPAC/ACSI merger.  Confirming financial results for the company and the ownership of intellectual property – such as ULIN – should have been the bedrock of any such due diligence.

*Damages*

152.   Between December 2015 and May 2016, Dr. Pottash acquired 132,432 shares plus 100,000 warrants of the company that would eventually become Ability, Inc.   In May 2016, Dr. Pottash sold essentially all of his shares at significant losses while the stock fluctuated in the $3-$4 range and the warrants later for an inconsequential sum.  In total, Dr. Pottash has suffered losses in excess of $1.1 million.

153.   All conditions precedent have been performed or waived.

36

154.   As a result of Defendants' wrongful conduct, Plaintiff has retained the undersigned law firm to represent them in this action and is required to pay the firm a reasonable attorney's fee.

**COUNT 1**
**Violation of Florida Securities & Investor Protection Act**
**(Pottash vs. Ability, Inc. and Gordon re: December 2015 Decision Not to Redeem Shares)**

155.   Dr. Pottash re-allege paragraphs 1 through 154 herein.

156.   Dr. Pottash asserts a claim against Defendants Ability, Inc. and Gordon for violation of the Florida Securities & Investor Protection Act, § 517.301, Fla. Stat. arising from Dr. Pottash's December 2015 decision not to redeem his shares of the Cambridge SPAC.

157.   In or around December 2015, Gordon, acting on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), rendered investment advice to Dr. Pottash in connection with the decision to redeem or not redeem his shares in the Cambridge SPAC.

158.   In connection with the December 2015 decision, Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), employed a device, scheme, or artifice to defraud, and  obtained money or property from Dr. Pottash by means of untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Dr. Pottash, by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89 and 94-96.

159.   In addition, the Cambridge SPAC (which later changed its name to Ability, Inc.) employed a device, scheme, or artifice to defraud, and  obtained money or property from Dr.

Pottash by means of untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Dr. Pottash, by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89, and 94-96.

160.    Dr. Pottash reasonably and justifiably relied upon the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89 and 94-96.

161.    As a direct and proximate result of this conduct, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands rescission or rescission damages (election to be made prior to trial) against Defendants Ability, Inc. and Gordon under § 517.211, Fla. Stat., as well as interest, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## COUNT 2
## Violation of Florida Securities & Investor Protection Act
### (Pottash vs. Ability, Inc. and Gordon re: December 2015 Investment in More Shares)

162.    Dr. Pottash re-allege paragraphs 1 through 154 herein.

163.    Dr. Pottash asserts a claim against Defendants Ability, Inc. and Gordon for violation of the Florida Securities & Investor Protection Act, § 517.301, Fla. Stat., arising from Dr. Pottash's December 2015 investment in the Cambridge SPAC.

164.    In or around December 2015, the Cambridge SPAC sold shares of its stock to Dr. Pottash. Buyer-seller privity existed between Dr. Pottash and the Cambridge SPAC, which later changed its name to Ability, Inc.

165.    Gordon on behalf of himself and on behalf of the Cambridge SPAC (which later changed its name to Ability, Inc.) rendered investment advice to Dr. Pottash as part of the

December 2015 transaction.   Gordon also personally participated in, aided, and solicited the December 2015 transaction.

166.   In connection with the December 2015 decision, Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), employed a device, scheme, or artifice to defraud, and  obtained money or property from Dr. Pottash by means of untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Dr. Pottash, by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104 and 108-114.

167.   In addition, the Cambridge SPAC (which later changed its name to Ability, Inc.) employed a device, scheme, or artifice to defraud, and  obtained money or property from Dr. Pottash by means of untrue statements of material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon Dr. Pottash, by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89, and 94-96.

168.   Dr. Pottash reasonably and justifiably relied upon the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104, and 108-114.

169.   As a direct and proximate result of this conduct, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands rescission or rescission damages (election to be made prior to trial) against Defendants Ability, Inc. and Gordon under § 517.211, Fla. Stat., as well as interest, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**COUNT 3**
**Common Law Fraud**
**(Dr. Pottash vs. Ability, Inc. and Gordon re: December 2015 Decision**
**Not to Redeem Shares)**

170.     Dr. Pottash re-alleges paragraphs 1 through 154 herein.

171.     Dr. Pottash asserts a claim for common law fraud against Ability, Inc. and Gordon, arising from Dr. Pottash's December 2015 decision not to redeem his shares of the Cambridge SPAC.

172.     In connection with Dr. Pottash's December 2015 decision whether or not to redeem his shares in the Cambridge SPAC, Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.) fraudulently induced Dr. Pottash to retain his shares by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, and 94-96.

173.     In addition the Cambridge SPAC (which later changed its name to Ability, Inc.) fraudulently induced Dr. Pottash to retain his shares by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89 and 94-96.

174.     Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), made these misrepresentations and omissions knowingly, intending that Dr. Pottash would rely upon them in making investing decisions. Likewise, the Cambridge SPAC (which later changed its name to Ability, Inc.) made these misrepresentations and omissions knowingly, intending that Dr. Pottash would rely upon them in making investing decisions.

40

175.     Gordon owed a duty to disclose all material facts regarding the investment and to provide complete, accurate and truthful information.  By voluntarily giving investment advice to Dr. Pottash, Gordon was obligated to act with reasonable care and obligated to disclose all material facts about the transaction to Dr. Pottash.

176.     Dr. Pottash reasonably relied upon these misrepresentations and omissions to his detriment.

177.     As a direct and proximate result of these actions, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands compensatory damages as well as interest, costs and such other relief as the Court deems just.

**COUNT 4**
**Common Law Fraud**
**(Dr. Pottash vs. Ability, Inc. and Gordon re: December 2015 Investment in More Shares)**

178.     Dr. Pottash re-alleges paragraphs 1 through 154 herein.

179.     Dr. Pottash asserts a claim for common law fraud against Ability, Inc. and Gordon arising from Dr. Pottash's December 2015 investment in more shares of the Cambridge SPAC.

180.     In connection with Dr. Pottash's December 2015 investment in more shares in the Cambridge SPAC, Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), fraudulently induced Dr. Pottash to buy more shares by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104 and 108-114.

181.     In addition, the Cambridge SPAC (which later changed its name to Ability, Inc.) fraudulently induced Dr. Pottash to retain his shares by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89 and 94-96.

182.    Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), made these misrepresentations and omissions knowingly, intending that Dr. Pottash would rely upon them in making investing decisions.  Likewise, the Cambridge SPAC (which later changed its name to Ability, Inc.) made these misrepresentations and omissions knowingly, intending that Dr. Pottash would rely upon them in making investing decisions.

183.    Gordon owed a duty to disclose all material facts regarding the investment and to provide complete, accurate and truthful information.  By voluntarily giving investment advice to Dr. Pottash, Gordon was obligated to act with reasonable care and obligated to disclose all material facts about the transaction to Dr. Pottash.

184.    Dr. Pottash reasonably relied upon these misrepresentations and omissions to his detriment.

185.    As a direct and proximate result of these actions, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands compensatory damages as well as interest, costs and such other relief as the Court deems just.

**COUNT 5**
**Negligent Misrepresentation/Restatement (Second) of Torts § 552**
**(Dr. Pottash vs. Ability, Inc. and Gordon re: December 2015 Decision**
**Not to Redeem Shares)**

186.    Dr. Pottash re-allege paragraphs 1 through 154 herein.

187.    Dr. Pottash asserts a claim for negligent misrepresentation pursuant to section 552 of the Restatement (Second) of Torts against Defendants Ability, Inc. and Gordon, arising from the December 2015 decision not to redeem the Cambridge SPAC shares.

188.    As part of the relationship between Dr. Pottash, on the one hand, and Gordon, and Ability, Inc., on the other hand, these Defendants owed a duty to disclose all material facts and to

provide accurate and truthful information about the investment in the Cambridge SPAC. By voluntarily giving investment advice to Dr. Pottash and voluntarily disclosing information about Ability Inc.'s business "pipeline" and backlog, Gordon and Ability, Inc. were obligated to act with reasonable care and obligated to disclose all material facts about the transaction to Dr. Pottash. These Defendants also owed a duty to exercise reasonable care or competence in obtaining and communicating information to Dr. Pottash. Further, each of these Defendants had a pecuniary interest in the information it gave to Dr. Pottash.

189. Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), breached this duty by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, and 94-96.

190. In addition, the Cambridge SPAC (which later changed its name to Ability, Inc.) breached this duty by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89 and 94-96.

191. Dr. Pottash justifiably relied upon these misrepresentations and omissions to his detriment.

192. As a direct and proximate result of these actions, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands compensatory damages against these Defendants as well as interest, costs, and such other relief as the Court deems just.

### COUNT 6
**Negligent Misrepresentation/Restatement (Second) of Torts § 552**
**(Dr. Pottash vs. Ability, Inc. and Gordon re: December 2015 Investment in New Shares)**

193. Dr. Pottash re-allege paragraphs 1 through 154 herein.

194.    Dr. Pottash asserts a claim for negligent misrepresentation pursuant to section 552 of the Restatement (Second) of Torts against Defendants Ability, Inc. and Gordon, arising from the December 2015 investment in more Cambridge SPAC shares.

195.    As part of the relationship between Dr. Pottash, on the one hand, and Gordon, and Ability, Inc. on the other hand, these Defendants owed a duty to disclose all material facts and to provide accurate and truthful information about the investment in the Cambridge SPAC.  By voluntarily giving investment advice to Dr. Pottash and voluntarily disclosing information about Ability Inc.'s business "pipeline" and backlog, Gordon and Ability, Inc. were obligated to act with reasonable care and obligated to disclose all material facts about the transaction to Dr. Pottash.  These Defendants also owed a duty to exercise reasonable care or competence in obtaining and communicating information to Dr. Pottash.  Further, each of these Defendants had a pecuniary interest in the information it gave to Dr. Pottash.

196.    Gordon, on behalf of himself and as an agent of the Cambridge SPAC (which later changed its name to Ability, Inc.), breached this duty by, among other things, the misrepresentations and omissions referred to in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104 and 108-114.

197.    In addition, the Cambridge SPAC (which later changed its name to Ability, Inc.) breached this duty by, among other things, the misrepresentations and omissions referred to in paragraphs 52, 59, 69, 83-89 and 94-96.

198.    Dr. Pottash justifiably relied upon these misrepresentations and omissions to his detriment.

199.    As a direct and proximate result of these actions, Dr. Pottash has been damaged.

WHEREFORE, Dr. Pottash demands compensatory damages against these Defendants as

well as interest, costs, and such other relief as the Court deems just.

COUNT 7<br>Conspiracy<br>(All Defendants)

200.  Plaintiff re-alleges paragraphs 1 through 154 and 178-185 herein.

201.  Plaintiff asserts a claim for civil conspiracy against all Defendants.

202.  In or around December 2013, and continuing to the present, the Defendants came to an agreement, common plan, and understanding to accomplish an unlawful purpose, namely, to sell the common stock of the Cambridge SPAC, the predecessor-in-interest by merger to Ability, Inc., to Plaintiff through a series of fraudulent and/or negligent misrepresentations and omissions.

203.  Members of the conspiracy committed multiple overt acts in furtherance of the conspiracy, including, but not limited to, the misrepresentations and omissions made to Plaintiff, as set forth in paragraphs 19, 44, 47, 52, 59, 62, 64, 69, 74, 80, 83-89, 94-96, 104 and 108-114.

204.  Each Defendant knew and understood the purpose and goals of the conspiracy, and each Defendant provided aid and assistance to the conspiracy. Specifically, in his capacity as trustee of the Family Trust, Morris provided aid and assistance to the conspiracy as set forth in paragraphs 120-126.

205.  As a direct and proximate result of the ongoing conspiracy, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands compensatory damages against these Defendants as well as interest, costs, and such other relief as the Court deems just.

45

## Jury Trial Demanded

Pursuant to Florida Rule of Civil Procedure 1.430, Plaintiff demands a jury trial on all claims so triable.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**



## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served this 27th

day of November 2017 to the following:

**Via the Court's E-Portal**

Michael Austin
maustin@mwe.com
mcabo@mwe.com
Kamal Sleiman
ksleiman@mwe.com
McDermott, Will & Emery, LLP
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-2184
*Counsel for Ability, Inc.*

Lewis F. Murphy
lmurphy@stroock.com
dtejada@strook.com
Strook & Strook & Lavan LLP
200 South Biscayne Boulevard, Suite 3100
Miami, FL 33131-5341
*Counsel for Benjamin Gordon*

J. Christian Word
christian.word@lw.com
Sarah Greenfield
Sarah.greenfield@lw.com
Latham & Watkins LLP
55 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
*Counsel for Benjamin Gordon*

**Via First Class Mail**

Jonathan Morris as Trustee
Of the Gordon Family 2007 Trust
3818 Herschel Avenue
Dallas, Texas 75219-2926

MCCABE RABIN, P.A.

   /s Ryon M. McCabe
Ryon M. McCabe
Florida Bar No. 009075
rmccabe@mccaberabin.com
e-filing@mccaberabin.com
Robert C. Glass
Florida Bar No. 052133
rglass@mccaberabin.com
1601 Forum Place, Ste. 505
West Palm Beach, Florida 33401
Telephone: (561) 659-7878

NOT A CERTIFIED COPY