EXHIBIT A

**EXHIBIT A**

Filing # 33274625 E-Filed 10/15/2015 12:17:42 PM

**IN THE CIRCUIT COURT OF THE 15TH**
**JUDICIAL CIRCUIT, IN AND FOR**
**PALM BEACH COUNTY, FLORIDA**

| | |
|---|---|
| BRIAN LEVY, on Behalf of Himself and All Others Similarly Situated, | ) ) ) |
|     Plaintiff, | ) Case No. 2015CA003339 ) ) |
| vs. | ) **Jury Trial Demanded** ) |
| BENJAMIN GORDON, MITCHELL I. GORDON, MICHAEL DURHAM, NATHAN GANTCHER, SCOTT LAURANS, CAMBRIDGE HOLDCO CORP., AND ABILITY COMPUTER & SOFTWARE INDUSTRIES LTD. | ) **CLASS REPRESENTATION** ) ) ) ) ) |
|     Defendants, | ) ) |
| and | ) |
| CAMBRIDGE CAPITAL ACQUISITION CORP., | ) ) |
|    Nominal Defendant. | ) |

**VERIFIED FIRST AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT**

  Plaintiff, by his attorneys, alleges as and for his first amended class action and derivative

complaint, upon personal knowledge as to himself and his own acts, and as to all other matters

upon information and belief:

**NATURE OF THE ACTION**

  1.  This lawsuit (the "Action") is a shareholder class action alleging, *inter alia*, *ultra*

*vires* acts, brought by Plaintiff on behalf of himself and the other public holders of Cambridge

Capital Acquisition Corp. ("Cambridge" or the "Company") common stock and against the

members of Cambridge's board of directors Benjamin Gordon, Mitchell I. Gordon, Michael

Durham, Nathan Gantcher, and Scott Laurans (collectively the "Board" or the "Individual

1

*** FILED: PALM BEACH COUNTY, FL  SHARON R BOCK, CLERK. 10/15/2015 12:17:42 PM ***

Defendants") as well as Cambridge's wholly-owned subsidiary, Cambridge Holdco Corp. ("Holdco") and Ability Computer & Software Industries, Ltd. ("Ability"). It is also a derivative action brought on behalf of Cambridge against the same Defendants.

2.     The Action arises from Defendants' actions in causing Cambridge to agree to combine with Ability and relocate to the Cayman Islands in a series of *ultra vires* transactions which will personally benefit the Individual Defendants to the tune of millions of dollars but will be to the detriment of Cambridge and its public shareholders (the "Transactions"). In this regard, Cambridge was created on or about October 1, 2013 and closed its initial public offering (the "IPO") on or about December 23, 2013. The proceeds from the IPO (minus proceeds used as working capital to provide for expenses) were deposited into a bank account (the "Trust Fund"). Pursuant to its amended and restated articles of incorporation, ***Cambridge was required to consummate a business combination by June 23, 2015*** (or by December 23, 2015 in the event that a definitive agreement to complete a business combination was executed but not consummated by June 23, 2015 (the "Termination Date")) ***or elect to liquidate*** and distribute its proceeds to shareholders *pro rata* per share. However, in the event the Company were to take the second course and liquidate, certain "Initial Shares" and "Private Units," valued at millions of dollars, that the Individual Defendants awarded themselves in conjunction with the IPO would not be entitled to receive any proceeds and thus would be worthless. In addition, $350,000.00 worth of loans made by CEO Gordon to the Company would not be repaid if the Company were to liquidate. Thus, each of Cambridge's directors has a very substantial pecuniary self-interest in causing Cambridge to enter into a business combination – even one that does not fully value the Company and is *ultra vires* – rather than liquidate.

3.     Following the IPO, the Individual Defendants engaged in a process of seeking out

businesses with which to engage in a business combination.  As part of this process, they caused Cambridge to sign non–disclosure agreements with approximately twelve potential counterparties to a business combination.  However, only two of these potential counterparties (one of which was Parakou Tankers, Inc.) proceeded to the next stage, which was due diligence and/or receiving (or providing) a letter of intent.  And the one potential counterparty other than Parakou thereafter notified the Individual Defendants that it rejected Cambridge as a strategic partner and was not willing to engage in a strategic transaction with Cambridge at that time. Subsequently, the Company executed an agreement with Parakou (the "Parakou Merger Agreement") on December 1, 2014, which was subsequently terminated on May 6, 2015 after shareholders received substantial negative information about the Parakou Merger Agreement (which information Defendants have publicly admitted they disclosed as a result of this lawsuit) and it became clear that it did not have sufficient shareholder support to receive approval.

4.      Aware of the looming June 23, 2015 deadline to either consummate, or enter an agreement to complete, a transaction or lose millions of dollars personally, the Individual Defendants hurriedly attempted to find another business with which to engage in a transaction. However, the Individual Defendants did not meet the deadline required by Cambridge's amended and restated articles of incorporation.  Instead, on June 29, 2015 the Individual Defendants caused the Company to enter into a term sheet with Ability, which term sheet was not a definitive agreement to complete a business combination and subject to multiple contingencies including additional "due diligence" and the hiring of an investment advisor to render a "fairness opinion."  Thereafter, a definitive agreement to consummate a business combination was executed on September 6, 2015.[1]  Further, as alleged in detail below, the

_____

[1]The *ultra vires* transaction with Ability is structured in the following format: (a) Cambridge initially will be merged with and into Holdco, which will survive the merger and

3

Transactions with Ability do not fairly value Cambridge and are not in the best interests of public shareholders. This is perhaps best illustrated by the fact that the investment bank hired to advise the Individual Defendants opined only that Ability had a fair market value of at least 80 percent of the cash Cambridge is contributing to the Transactions, not 100 percent or some number close to 100 percent.

5.     Finally, further compounding their breaches of fiduciary duty, the Individual Defendants concealed material information from Plaintiff and Cambridge's other public shareholders in the proxy statement (the "Proxy Statement") that they caused to be filed with the SEC and distributed to shareholders by use of the Internet in conjunction with recommending that shareholders vote their shares in favor of the Sale Agreement.

## JURISDICTION

6.     This Court has jurisdiction over this action because Cambridge is a publicly traded corporation headquartered in this State and because the improper conduct alleged in this Complaint occurred in and/or was directed at Florida. Additionally, the Court has jurisdiction over each of the Defendants because their wrongful conduct challenged in this Complaint was directed at, and intended to have its primary effect in, this State.

---

become a new public company named "Ability Inc. (the "Ability Merger") and (b) subsequent to the Ability Merger, Ability's shareholders will exchange 100% of Ability's ordinary shares for ordinary shares of Holdco and cash (the "Share Exchange," together with the Ability Merger, the "Transactions"). In connection with the Ability Merger, each share of Cambridge will be exchanged for one share of Holdco, except that holders, or "public stockholders," of shares of Cambridge's common stock sold in its initial public offering, or "public shares," shall be entitled to elect instead to receive a pro rata portion of Cambridge's trust account, as provided in Cambridge's constitutional documents. Additionally, each outstanding Cambridge warrant will entitle the holder to purchase one ordinary share of Holdco in lieu of one share of Cambridge common stock. Under the merger agreement, upon consummation of the share exchange, the holders of Ability's capital stock will be entitled to receive, in their pro rata portion, (1) 17,173,267 ordinary shares of Holdco; (2) $18,150,000 in cash; and (3) an additional number of ordinary shares of Holdco to be issued upon and subject to Ability achieving certain net income targets following the Share Exchange (the "Net Income Shares").

7.     Venue is proper in this Court pursuant to Florida Statutes §§ 47.011 and 47.051 since Cambridge's principal place of business is located in Palm Beach County, and the Defendants' wrongful acts were principally performed in or directed at Palm Beach County.

8.     This action challenges the internal affairs or governance of Cambridge and hence is not removable to Federal Court under the Class Action Fairness Act of 2005 or the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f).

**PARTIES**

9.     Plaintiff Brian Levy is the owner of shares of Cambridge common stock and has continuously owned such shares at all relevant times.

10.     Nominal Defendant Cambridge is a Delaware incorporated, Florida headquartered, publicly traded company formed on October 1, 2013. Cambridge is organized and exists under the laws of the State of Delaware and is headquartered at 525 South Flagler Drive, Suite 201, West Palm Beach, Florida. Cambridge is a blank check company formed in order to effect a merger, capital stock exchange, asset acquisition or other similar business combination with one or more businesses or entities in accordance with, and under the terms of, its governing articles of incorporation. The Company's stock trades on the NASDAQ CM under the ticker "CAMB." This Court has jurisdiction over Cambridge because it is headquartered in this state and because the wrongful actions challenged in this Complaint were directed at and/or intended to have their primary effect in this state.

11.     Defendant Benjamin Gordon ("CEO Gordon") has served as a director of the Company at all relevant times. CEO Gordon is Cambridge's CEO. CEO Gordon is interested in the Transactions because failure to consummate the Transactions will result in the Initial Shares and Private Units (valued at over $600,000.00) of Cambridge he holds becoming worthless.

Further, if the Transactions are not consummated, then certain unsecured convertible promissory notes – issued to CEO Gordon by the Company in the aggregate amount of $350,000, in consideration for several loans from CEO Gordon to fund Cambridge's working capital requirements until a business combination is consummated – will not be repaid.  However, if the Transactions are completed, CEO Gordon will be able to convert the full amount of these notes into 35,000 ordinary shares and 35,000 warrants of Holdco.  In addition, CEO Gordon is expected to serve as a director of the Company following consummation of the Transaction and, in connection therewith, is expected to receive compensation of a to be determined amount. Additionally, if Cambridge is required to be liquidated and there are no funds remaining to pay the costs associated with the implementation and completion of such liquidation, Cambridge's executive officers, including CEO Gordon, have agreed to advance Cambridge the funds necessary to pay such costs and complete such liquidation and not to seek repayment for such expenses.  This Court has jurisdiction over CEO Gordon because CEO Gordon is a Florida resident, Cambridge is headquartered in Florida and many of CEO Gordon's actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

12.     Defendant Mitchell I. Gordon ("President Gordon") has served as President, Chief Financial Officer ("CFO") and as a director of the Company at all relevant times.  President Gordon is interested in the Transactions because failure to consummate the Transactions will result in the Initial Shares and Private Units (valued at over $885,000.00) of Cambridge he holds becoming worthless.  Further, if Cambridge is required to be liquidated and there are no funds remaining to pay the costs associated with the implementation and completion of such liquidation, Cambridge's executive officers, including President Gordon, have agreed to advance Cambridge

the funds necessary to pay such costs and complete such liquidation and not to seek repayment for such expenses. Additionally, in connection with consummation of the Transactions, President Gordon will become a director of Holdco, and as such will receive any cash fees, stock options or stock awards that the Holdco board of directors determines to pay its non-executive directors. This Court has jurisdiction over President Gordon because Cambridge is headquartered in Florida and many of President Gordon's actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

13.      Defendant Michael Durham ("Mr. Durham") has served as a director of the Company at all relevant times.  Mr. Durham is interested in the Transactions because failure to consummate the Transactions will result in the Initial Shares and Private Units (valued at over $629,000.00) of Cambridge he holds becoming worthless.  This Court has jurisdiction over Mr. Durham because Cambridge is headquartered in Florida and many of Mr. Durham's actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

14.      Defendant Nathan Gantcher ("Mr. Gantcher") has served as a director of the Company at all relevant times.  Mr. Gantcher is interested in the Transactions because failure to consummate the Transactions will result in the Initial Shares and Private Units (valued at over $1,000,000.00) of Cambridge he holds becoming worthless.  This Court has jurisdiction over Mr. Gantcher because he is a Florida resident, Cambridge is headquartered in Florida and many of Mr. Gantcher's actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

15.      Defendant Scott Laurans ("Mr. Laurans") has served as a director of the Company at all relevant times.  Mr. Laurans is interested in the Transactions because failure to consummate

the Transactions will result in the Initial Shares and Private Units (valued at over $1,000,000.00) of Cambridge he holds becoming worthless.  This Court has jurisdiction over Mr. Laurans because Cambridge is headquartered in Florida and many of Mr. Laurans' actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

16.    Defendant Ability provides interception, monitoring and cyber intelligence tools to serve the needs of security and intelligence agencies, military forces, law enforcement and homeland security agencies worldwide.  Ability's product portfolio includes interception systems of satellite communications, advanced geo-location systems, cyber solutions and a crime prevention system. Ability's interception systems for satellite and cellular networks are used to intercept voice conversations, messages and data transmitted over the air. Ability's geo-location system is used to geographically target mobile phones and is sold independently or as an additional feature of the active interception system. Ability's cyber solutions provide the user with the ability to extract and view information from a mobile phone and listen to communications over the phone. Ability's crime prevention solution, which has not yet been commercialized, is designed as a software solution to analyze information extracted from mobile phones and provide predictive data.  This Court has jurisdiction over Ability because many of its actions challenged in this Complaint occurred in substantial part in, were directed at, and/or intended to have their primary effect in, Florida.

17.    Defendant Holdco is a wholly-owned subsidiary of Cambridge formed solely for the purpose of effectuating the Merger.  Holdco was incorporated under the laws of the Cayman Islands on September 1, 2015.  Holdco's principal executive office is located at 525 South Flagler Drive, Suite 201, West Palm Beach, FL 33401.  Following the Transactions, Holdco's principal

executive office will be located at Yad Harutzim 14, Tel Aviv, Israel, 6770007.  This Court has

jurisdiction over Holdco because its principal executive office is located in Florida and many of

its actions challenged in this Complaint occurred in substantial part in, were directed at, and/or

intended to have their primary effect in, Florida.

18.      Each Defendant herein is sued individually.  The Individual Defendants are also

sued in their capacity as directors of Cambridge.  The liability of each Defendant arises from the

fact that they have engaged in, or aided and abetted, all or part of the unlawful acts, plans,

schemes, or transactions complained of herein.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

19.      Under applicable statutory and common law, the directors of a publicly held

company such as Cambridge have fiduciary duties of care, good faith and loyalty, and are liable

to Cambridge and its shareholders for breaches thereof.  Each Individual Defendant owed and

owes Cambridge and its shareholders fiduciary obligations and were and are required to: (a) act

in the best interests of Cambridge and its shareholders, instead of in their own personal financial

interests; (b) use their ability to control and manage Cambridge in a fair, just and equitable

manner; (c) refrain from abusing their positions of control; and (d) not favor their own personal

interests at the expense of Cambridge and its public shareholders.  Further, where it appears that

a director has obtained personal benefits from a transaction involving the Company, and the

transaction is drawn into question as between him and the shareholders of the Company, the

burden is upon the director or officer to show that the transaction has been fair, open and in the

utmost good faith.

20.      Here, the Individual Defendants are breaching their fiduciary duties to Cambridge

and its public shareholders by acting to cause or facilitate the Transactions.  The Transactions

with Ability are not in the best interest of Cambridge or its public shareholders but are in the best interests of the Individual Defendants.

21.     Because the Individual Defendants are personally benefitting from the Transactions, the burden of proving their inherent or entire fairness, including the process by which they were reached and the fairness of each of their terms is borne by them as a matter of law.

## CLASS REPRESENTATION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Rule 1.220 (b)(1) and (2) of the Florida Rules of Civil Procedure on behalf of himself and all other shareholders of the Company (except the Defendants herein, EarlyBirdCapital Inc. ("EarlyBirdCapital"),[2] and any person(s), firm(s), trust(s), corporation(s), or other entit(ies) related to or affiliated with them as defined under SEC rules), who are or will be threatened with injury arising from Defendants' actions, as more fully described herein (the "Class").

23.     The members of the Class are so numerous that separate joinder of each member would be impracticable.  While the exact number of Class members is unknown to Plaintiff, and can be ascertained only through appropriate discovery, Plaintiff believes there are many hundreds, if not thousands, of Class members.  As of June, 2015, Cambridge had over 3 million shares of common stock outstanding and owned by over 300 beneficial shareholders.

24.     Plaintiff's claims or defenses raise questions of law or fact common to the questions of law or fact raised by the claim or defense of each member of the class. The predominant questions of law and fact include, among others, whether:

       (a)     the Defendants have and are breaching their fiduciary duties to the

---

[2] EarlyBird Capital is one of the Company's initial stockholders.  It served as the underwriter for Cambridge's IPO and as an investment banker on the Transactions.

detriment of Cambridge's shareholders; and

       (b)    the Class has been damaged and the extent to which members of the Class have sustained damages, and what is the proper measure of those damages.

25.    Plaintiff's claims or defenses are typical of the claims or defenses of each member of the class in that all members of the Class will be damaged by Defendants' actions.

26.    Plaintiff can fairly and adequately protect and represent the interests of each member of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation.

27.    The prosecution of separate claims or defenses by or against individual members of the class would create a risk of either inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class or adjudications concerning individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

28.    The parties opposing the class have acted or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class as a whole appropriate.

29.    The questions of law or fact common to the claims or defenses of Plaintiff and the claims or defenses of each members of the Class predominate over any question of law or fact affecting only individual members of the class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

## DERIVATIVE ALLEGATIONS

30.     Plaintiff also brings this action as a derivative action on behalf of, and for the benefit of, Cambridge pursuant to Fla. Stat. § 607.07401.  Plaintiff has been a shareholder of Cambridge at all relevant times.

31.     Plaintiff will (and is able to) fairly and adequately represent Cambridge's interests in enforcing and prosecuting its rights, and has retained competent counsel experienced in this type of litigation to prosecute this action.

## DEMAND FUTILITY

32.     Plaintiff has not made a demand on Cambridge's board to prosecute this Action, as there are no disinterested directors of Cambridge as pertains to the Transactions challenged herein.  Among other things, as set forth herein, the Individual Defendants collectively stand to lose millions of dollars if the Transactions are not consummated.

33.     Demand is also excused because the Transactions are *ultra vires* and cannot be ratified by the Board.  Further, to the extent that Cambridge presently maintains or previously maintained officers' and directors' liability insurance coverage, that insurance would be the primary or principal source of any recovery against the Defendants, and would be rendered void if Cambridge commenced proceedings against the Individual Defendants, as these policies uniformly contain provisions which void coverage if the company brings suit in its own name.

## SUBSTANTIVE ALLEGATIONS

A.     **Background**

34.     Cambridge is a publicly traded company headquartered in Palm Beach County. On December 23, 2013, the Company closed its initial public offering of 7,000,000 units, with each unit consisting of one share of its common stock and one warrant to acquire one share of its

common stock upon consummation of an initial business combination. On December 30, 2013, Cambridge consummated the sale of an additional 1,050,000 units, which were subject to an over-allotment option granted to the underwriters of its initial public offering (the "IPO"). The units from the initial public offering (including the over-allotment option) were sold at an offering price of $10.00 per unit, generating total gross proceeds of $80,500,000.

35.     Simultaneously with the consummation of the initial public offering and the exercise of the underwriters' over-allotment option, Cambridge consummated the private sale of 472,125 units to its initial stockholders (including the Individual Defendants and EarlyBirdCapital and its designees), in each case at $10.00 per unit for an aggregate purchase price of $4,721,250.  The net proceeds from the IPO, together with the net proceeds from the private sale of units, or a total of $81,305,000, was deposited into the Trust Fund.

36.     Shortly after the IPO, the Individual Defendants caused Cambridge to begin consideration of potential target businesses with the objective of consummating a business combination.  As part of this process, they caused Cambridge to sign non–disclosure agreements with approximately 12 potential counterparties to a business combination.  However, only two of these potential counterparties (one of which was Parakou) proceeded to the next stage, which was due diligence and/or receiving (or providing) a letter of intent.  And the one potential counterparty other than Parakou thereafter notified the Individual Defendants that it rejected Cambridge as a strategic partner and was not willing to engage in a strategic transaction with Cambridge at that time – thus leaving Parakou as the only potential counterparty to a business combination.

37.     While Cambridge subsequently entered into the Parakou Merger Agreement, that agreement was subsequently terminated on May 6, 2015 after shareholders received substantial

13

negative information about the Parakou Merger Agreement (which information Defendants have publicly admitted they disclosed as a result of this lawsuit) and it became clear that it did not have sufficient shareholder support to receive approval.

38.     Thereafter, EarlyBird Capital and another entity, Migdal Underwriting & Business Initiatives, Ltd. ("Migdal") introduced Cambridge to Ability.  Cognizant of the looming June 23, 2015 deadline for the Company to have executed a definitive agreement or liquidate (in which case the Individual Defendants would have lost millions of dollars of their investments in Cambridge, and in the case of CEO Gordon, an additional $350,000 for promissory notes issued to him by the Company), the Individual Defendants tried to move expeditiously but a definitive agreement to complete a business combination was not actually executed until September 6, 2015 when the Ability Merger Agreement was signed.

**B.    The Individual Defendants Caused Cambridge to Agree to the Ability Transaction Notwithstanding That It Is Not in the Best Interests of Cambridge and Its Public Shareholders**

39.     Pursuant to the Ability Merger Agreement (a) Cambridge will merge into Holdco, with Holdco surviving the merger and becoming a publicly traded company (the "Ability Merger") and (ii) subsequent to the Ability Merger, Ability and its shareholders will exchange 100% of Ability's shares for ordinary shares of Holdco.  Under the terms of the Ability Merger Agreement, the initial consideration to Ability will be approximately 17.173 million newly-issued ordinary shares of Cambridge valued at $10.10 per share, subject to adjustment as provided for in the definitive agreement, plus $18.15 million in cash, for aggregate consideration at closing of approximately $192 million.  Pursuant to the Ability Merger Agreement, Ability's stockholders have agreed not sell any Cambridge shares that they received for 2 years after the closing, subject to certain exceptions. Following the closing of the transactions, the public

company will be a Cayman Island company.  The outstanding securities of Cambridge will be exchanged for a like number of securities of the Cayman Island public company.  In addition, Ability shareholders will be entitled to receive up to an aggregate of 8.45 million earnout shares which shall be held in escrow at closing and released based on meeting net income performance targets in 2015, 2016, 2017, and 2018 of $27 million, $40 million, $60 million, and $80 million, respectively.  As a result of the Transactions, Holdco will become a public company and will change its name to "Ability, Inc." and Cambridge's current shareholders will hold as little of 29% of the new company.[3]

40.     While the Transactions with Ability will benefit the Individual Defendants, they are an undesirable outcome for Cambridge and its public shareholders.  In this regard, the Individual Defendants have publicly acknowledged  that, following consummation of the Transactions, the Company's public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a United States company. This is because the surviving Company will be incorporated in the Cayman Islands, which does not have a well-developed body of corporate law and limited judicial precedents, and therefore shareholders may well have fewer rights and protections under the law of the Cayman Islands

_____

[3]Three  potential  scenarios  regarding  the  share  ownership  of  Holdco  following consummation of the Transactions are as follows;   (i) assuming that no stockholders of Cambridge elect to convert their public shares into cash in connection with the Ability Merger, the Ability shareholders and the other persons receiving ordinary shares of Holdco comprising a portion of the share exchange consideration will own approximately 59.8% of the ordinary shares of Holdco to be outstanding immediately after the business combination and the former Cambridge stockholders will own approximately 40.1% of Holdco's outstanding ordinary shares, (ii) if the maximum number of Cambridge public shares is converted into cash, such percentages will be approximately 70% and 30%, respectively, and (iii) if no public shares are converted and thereafter the full net income shares are earned, the former Cambridge stockholders would own approximately  29%  of  the  total  outstanding  stock  and  Ability  shareholders  would  own approximately 71%, assuming that no other shares are issued.

than they currently do.  Indeed, the following chart demonstrates certain of the key differences between the rights that Cambridge shareholders currently have and the rights they will have following consummation of the Transactions:

| Right | Current | Following Consummation of Transactions |
|---|---|---|
| **Inspection of Books and Records** | Any stockholder may inspect the corporation's books and records for a proper purpose during the usual hours for business. | Shareholders generally do not have any rights to inspect or obtain copies of the register of shareholders or other corporate records of a company. |
| **Stockholder/Shareholder Lawsuits** | A stockholder may bring a derivative suit subject to procedural requirements. | The decision to institute proceedings on behalf of a company is generally taken by the company's board of directors. A shareholder may be entitled to bring a derivative action on behalf of the company only in **certain limited circumstances.** |
| **Fiduciary Duties of Directors** | Directors must exercise a duty of care and duty of loyalty and good faith to the company and its stockholders. | A director owes a fiduciary duty to exercise loyalty, honesty and good faith to the company as a whole. Such duties are owed to the  company but may be owed directly to creditors or shareholders in **certain limited circumstances.** |
| **Limited Liability of Directors** | Permits the limiting or eliminating of the monetary liability of a director to a corporation or its stockholders, except with regard to breaches of duty of loyalty, intentional misconduct, unlawful repurchases or dividends, or improper personal benefit. | ***Liability of directors may be limited***, except with regard to their own fraud or willful default. |

41.     Further, the Individual Defendants have acknowledged that following consummation of the Transactions certain of the Company's directors and officers will be nationals or residents of jurisdictions other than the United States and all or a substantial portion

of their assets would be located outside the United States.  As a result, it may be difficult for investors to effect service of process within the United States on these individuals, or enforce judgments obtained in the United States courts against them.  Among other limitations, Cayman Islands companies may not have standing to initiate a shareholders derivative action in a Federal court of the United States.  Further, the Individual Defendants have admitted that they have been advised by their Cayman Islands legal counsel that the courts of the Cayman Islands are unlikely (i) to recognize or enforce against us judgments of courts of the United States predicated upon the civil liability provisions of the federal securities laws of the United States or any state; and (ii) in original actions brought in the Cayman Islands, to impose liabilities against them predicated upon the civil liability provisions of the federal securities laws of the United States or any state, insofar as the liabilities imposed by those provisions are penal in nature.

42.    Indeed, the defendants have admitted that they have adopted provisions which may frustrate or prevent any attempts by the Company's shareholders to replace or remove the Company's current management members by making it more difficult for shareholders to replace members of the Board, which is responsible for appointing the members of our management. These provisions include, among other things, provisions that (a)  authorize the Company's Board to issue preferred shares and to determine the price and other terms, including preferences and voting rights, of those shares without shareholder approval, (b) establish advance notice procedures for nominating directors or presenting matters at shareholder meetings; and (c) limit the persons who may call special meetings of shareholders.

43.    Further, the Company's public shareholders may suffer adverse tax consequences as a result of the Transactions.  In this regard, if 75% or more of the Company's gross income in a taxable year is passive income, then the Company will be considered as a passive foreign

investment company, or "PFIC," for United States federal income tax purposes. Alternatively, the Company will be considered to be a PFIC if at least 50% of its assets in a taxable year are held for the production of, or produce, passive income. Once treated as a PFIC, for any taxable year, a foreign corporation will generally continue to be treated as PFIC for all subsequent taxable years. Thus, if the Company were to be a PFIC, and a U.S. Holder does not make an election to treat it as a "qualified electing fund," or QEF, or a "mark-to-market" election, "excess distributions" to a U.S. Holder, and any gain recognized by a U.S. Holder on a disposition of the Company's ordinary shares, would be taxed in an unfavorable way. Among other consequences, the Company's dividends, to the extent that they constituted excess distributions, would be taxed at the regular rates applicable to ordinary income. In addition, gains on the sale of the Company's shares would be treated in the same way as excess distributions.

44.     To further ensure shareholder approval of the Transactions and the personal benefits the Individual Defendants will obtain, they even agreed that the Cambridge Initial Stockholders (including themselves), and/or Ability and/or Ability's shareholders and/or their respective affiliates may attempt to "buy the shareholder vote" by purchasing shares from institutional and other investors who vote, or indicate an intention to vote, against the Transactions, or execute agreements to purchase such shares from such investors in the future, or they may enter into transactions with such investors and others to provide them with incentives to acquire shares of Cambridge's common stock or vote their shares in favor of the merger proposal. The purpose of such share purchases and other transactions would be to increase the likelihood of satisfaction of the requirements that that Cambridge have cash on hand of $40,000,000 after giving effect to payment of amounts that Cambridge will be required to pay to converting stockholders upon consummation of the transactions contemplated by the merger

agreement.  The Defendants have acknowledged that entering into any such arrangements may have a depressive effect on Cambridge's common stock because it may result in an investor or holder having the ability to effectively purchase shares at a price lower than market and may therefore be more likely to sell the shares he owns, either prior to or immediately after the special meeting.

C.  **Cambridge's Directors Have Publicly Admitted That They Have Conflicting Interests in Connection with the Transactions**

45.  Cambridge's directors have publicly admitted that they have conflicting interests in connection with the Transactions and have even admitted that these interests may have influenced their decision to approve the transaction with Ability.  These conflicting interests include the following:

- If the business combination with Ability or another business combination is not consummated by December 23, 2015, Cambridge will cease all operations except for the purpose of winding up, redeeming 100% of the outstanding public shares for cash and, subject to the approval of its remaining stockholders and its board of directors, dissolving and liquidating. *In such event, the 2,012,500 initial shares held by Cambridge's initial stockholders, including its directors and officers, which were acquired for an aggregate purchase price of $25,000 prior to Cambridge's initial public offering, would be worthless because Cambridge's initial stockholders are not entitled to participate in any redemption or distribution with respect to such shares.*

- Cambridge's initial stockholders, including its directors and officers, and EarlyBirdCapital purchased an aggregate of 472,125 private units [include Gordon Family Trust] from Cambridge for an aggregate purchase price of $4,721,250 (or $10.00 per unit). These purchases took place on a private placement basis simultaneously with the consummation of the initial public offering. All of the proceeds Cambridge received from these purchases were placed in the trust account.

- The purchasers of the private units waived the right to participate in any redemption or liquidation distribution with respect to such private units. *Accordingly, the Cambridge shares and warrants underlying the private units will become worthless if Cambridge does not consummate a*

19

*business combination by December 23, 2015 (as will the Cambridge warrants held by public stockholders).*

- The transactions contemplated by the merger agreement provide that Benjamin Gordon and Mitchell Gordon will be directors of Holdco after the closing of the business combination. As such, in the future each will receive any cash fees, stock options or stock awards that the Holdco board of directors determines to pay to its non-executive directors.

- Currently, it is anticipated that non-employee directors, such as Messrs. Benjamin Gordon and Mitchell Gordon, of Holdco following the business combination will receive an annual retainer fee and annual awards under Holdco's 2015 Long-Term Incentive Plan in amounts to be determined by the board of directors of Holdco in its discretion. In addition, nonemployee directors of Holdco may be eligible to receive a fee for each board meeting attended in person, as may be determined by the board of directors. Finally, as it is anticipated that either or both of Messrs. Gordon and Gordon will become members of one or more committees of the Holdco board of directors following the business combination, and would receive an additional annual fee in an amount to be determined by Holdco's board of directors for serving in such role.

- If Holdco is unable to complete a business combination within the required time period, Cambridge's executive officers will be personally liable to ensure that the proceeds in the trust account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by Cambridge for services rendered or contracted for or products sold to Cambridge, but only if such a vendor or target business has not executed such a waiver.

- Cambridge's initial stockholders, including its officers and directors, and their affiliates are entitled to reimbursement of out-of-pocket expenses incurred by them in connection with certain activities on Cambridge's behalf, such as identifying and investigating possible business targets and business combinations. However, if Cambridge fails to consummate a business combination within the required period, they will not have any claim against the trust account for reimbursement. Accordingly, Cambridge may not be able to reimburse these expenses if the business combination with Ability or another business combination, is not completed by December 23, 2015.

- Since its inception, Benjamin Gordon, Cambridge's chief executive officer, has made loans from time to time to Cambridge to fund certain capital requirements. As of the date of this proxy statement/prospectus, an aggregate of $350,000 principal amount of these loans is outstanding. These loans are evidenced by non-interest bearing notes that are

20

convertible at Mr. Gordon's election upon the consummation of an initial business combination into units of Cambridge, at a price of $10.00 per unit. Mr. Gordon has indicated he intends to convert the full amount of the notes into units, resulting in him being issued an aggregate of 35,000 ordinary shares and 35,000 warrants of Holdco. If the business combination is not consummated, the notes will not be repaid or converted and will be forgiven.

- If Cambridge is required to be liquidated and there are no funds remaining to pay the costs associated with the implementation and completion of such liquidation, Cambridge's executive officers have agreed to advance Cambridge the funds necessary to pay such costs and complete such liquidation (currently anticipated to be no more than approximately $15,000) and not to seek repayment for such expenses.

**D.     The Materially Misleading and/or Incomplete Proxy Statement**

46.     In addition, the Individual Defendants are breaching their fiduciary duty of full disclosure to Plaintiff and the Company's other public shareholders in connection with the Transactions. In this regard, on September 18, 2015, the Individual Defendants filed the Proxy Statement with the SEC and made the same available to Plaintiff and the Company's other public shareholders via the internet. However, the Proxy Statement is deficient in that it misrepresents and/or omits, *inter alia*, material information as alleged below:

a)     According to the Proxy Statement, the Company's amended and restated Certificate of Incorporation provides that the Company will continue in existence only until June 23, 2015 (or December 23, 2015 if the Company has executed a definitive agreement for an initial Business Combination by June 23, 2015, but has not completed the initial Business Combination by June 23, 2015). The Ability Merger Agreement was signed on September 6, 2015. Therefore, the Ability Merger Agreement is an *ultra vires* act and the Defendants have failed to disclose this fact.

Violations of a corporation's articles of incorporation are material and must be disclosed.

b)     According to the Proxy Statement, Shai Greenwald, an employee of BGSA, which was founded by CEO Gordon, had several meetings with Ability which ultimately led to the signing of the term sheet. The Proxy Statement is deficient because it fails to disclose the compensation paid to

21

Mr. Greenwald or BGSA in connection with Mr. Greenwald's participation in those meetings.

The conflicts of interest of each of Cambridge's directors is material and must be disclosed.

c)    According to the Proxy Statement, subsequent to the termination of the Parakou Merger Agreement, Cambridge was introduced to Ability through EarlyBirdCapital and Migdal. At that point, a non-disclosure agreement was executed and written information was provided to Cambridge on June 3, 2015. A conference call was then held on June 9, 2015 and it was decided on that call that representatives of Cambridge and Ability should meet in person to discuss a potential transaction between the parties. The Proxy Statement is deficient because it fails to disclose (i) the relationship, if any, between EarlyBirdCapital and Ability, (ii) the relationship, if any, between Migdal and Ability, (iii) the identity of the participants in the June 9, 2015 conference call, and (iv) the substance of the discussion had on the June 9, 2015 conference call.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

d)    According to the Proxy Statement, on June 12, 2015, Shai Greenwald met with Anatoly Hurgin, co-founder and CEO of Ability, Hagai Yedid and Eyal Tzur, a consultant to Ability and Chief Executive Officer and sole shareholder of Ability Security Systems Ltd. ("ASM"). At this meeting, the parties discussed the company, its products, market position and future prospects. On June 16, 2015, Mr. Greenwald had a second meeting with Hagai Yedid and Eyal Tzur, at Ability's offices in Tel Aviv. Thereafter, further conversations and market due diligence took place and a term sheet was signed on June 29, 2015 which included financial terms of the proposed transaction. The Proxy Statement is deficient because it fails to disclose (i) the rationale for Shai Greenwald, instead of a member of Cambridge's Management or Board, engaging in these discussions, (ii) the substance of the discussion had at the June 12, 2015 meeting regarding the company, its products, market position and future prospects, (iii) the substance of the discussions had at the June 16, 2015 meeting, (iv) the terms, and substance thereof, contained in the term sheet, (v) the identity of the individual(s) who negotiated the term sheet on behalf of Cambridge, and (vi) the dates of meetings of Cambridge's Board, and the substance of

discussions had, regarding a transaction with Ability, or any alternative thereto, prior to the signing of the term sheet.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

e) According to the Proxy Statement, on July 2, 2015, Mr. Greenwald and Mitchell Gordon met with representatives of Ability in Tel Aviv. There were further discussions about the market in which Ability competes, internal systems, financial projections, products and product development, research and development, competition and process. The Proxy Statement is deficient because it fails to disclose the substance of these discussions.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

f) According to the Proxy Statement, Migdal has effectively served on both sides of the transaction. In this regard, the Proxy Statement describes Midgal as Ability's investment banking advisor and indicates that it is entitled to receive a certain portion of Holdco shares otherwise issuable to Ability. However, Cambridge also paid Migdal a fee of $1,062,000, ostensibly for introducing Ability to Cambridge and or assistance in the negotiating process. The Proxy Statement is deficient because it fails to disclose (i) the rationale for Cambridge to a pay a fee to Ability's investment banking advisor, (ii) the substance of the assistance that Migdal provided in the negotiating process and (iii) any steps taken to address the above conflicts of interest.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

g) According to the Proxy Statement, on July 16, 2015, Cambridge retained the services of Integra BD and International Marketing LTD. ("Integra"), an industry expert, to assist in due diligence on Ability. The Proxy Statement is deficient because it fails to disclose (a) who recommended Integra to Cambridge and (b) the compensation paid to Integra for its services.

This information is material for Cambridge's shareholders to determine

the extent to which the Individual Defendants complied with their fiduciary duties to them.

h)   On July 27, 2015, Benjamin Gordon, Shai Greenwald and Mitchell Gordon again met with representatives of Ability at their headquarters in Tel Aviv. This team spent a week in Israel, working with the company, meeting with consultants and lawyers and discussing corporate strategy and prospects for growth.  The Proxy Statement is deficient because it fails to disclose the substance of the discussions had regarding corporate strategy and prospects for growth.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

i)   According to the Proxy Statement, on July 29, 2015 Cambridge retained Consulting Ltd., an affiliate of Economic Partners LLC, to conduct a Quality of Earnings review of Ability.  The Proxy Statement is deficient because it fails to disclose who recommended Consulting Ltd. to Cambridge.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

j)   According to the Proxy Statement, on July 30, 2015 Cambridge retained Intelligo Group to conduct background checks on Ability's executives. The Proxy Statement is deficient because it fails to disclose (i) who recommended Intelligo Group to Cambridge and (ii) the compensation payable to Intelligo Group for its services.

This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

k)   According to the Proxy Statement, Cambridge interviewed potential board members that would be interested in serving following the consummation of the business combination.  The Proxy Statement is deficient because it fails to disclose (i) how many potential board members were interviewed, (ii) the criteria used to evaluate these potential board members, (iii) the identity of  the potential board members who were interviewed, and (iv) who conducted these interviews.

> This information is material for Cambridge's shareholders to determine the extent to which the Individual Defendants complied with their fiduciary duties to them.

**E.      This Lawsuit Has Already Conferred a Benefit on Cambridge's Shareholders by Causing Cambridge to Correct Material Omissions in Its Registration Statement**

47.     Defendants have publicly admitted that as a result of the lawsuit, and in connection with seeking Cambridge's shareholders' votes for the adoption of the Parakou Merger Agreement and transactions contemplated thereby, the Individual Defendants caused Cambridge to issue additional proxy soliciting materials on a Form DEFA14A (the "Additional Proxy Information") with the SEC on April 17, 2015, which disclosed information, sought by Plaintiff, regarding, among other things, the conflicts of interest of the Individual Defendants and their advisors, as follows (the "Parakou Supplemental Disclosures"):

(a)     That the market value of each of the Cambridge directors' equity ownership in Cambridge common stock and units was as follows:

| **Directors** | **Common Stock** | **Units** | **Aggregate Value ($)** |
|---|---|---|---|
| Benjamin Gordon | 5,000 | 55,483 | 629,547 |
| Mitchell I. Gordon | 60,000 | 27,716 | 886,632 |
| Michael J. Durham | 40,000 | 22,173 | 629,708 |
| Nathan Gantcher | 60,000 | 44,346 | 1,060,416 |
| Scott B. Laurans | 60,000 | 44,346 | 1,060,416 |

(b)     The compensation that Mr. Benjamin Gordon was expected to receive as special advisor to the board of directors of Holdco following the Parakou Merger

(c)     The compensation that Mr. Mitchell Gordon was expected to receive for serving as a director of Holdco following the Parakou Merger.

(d)     That EarlyBirdCapital, in its role as investment banker to Cambridge, has provided Cambridge with advice and assistance in reviewing potential targets with which to consummate a business combination and arranging meetings with and preparing materials for investors in connection with the consummation of the mergers, as well as providing general advice with respect to special acquisition corporation transactions.

NOT A CERTIFIED COPY

(e)     That each member of Cambridge's Board was asked to join the Board by Mr. Benjamin Gordon.

(g)     Mr. Mitchell I. Gordon recommended Derek Zissman to serve on the board of directors of Holdco. Mr. Gordon and Mr. Zissman had a business and personal relationship prior to Mr. Gordon's recommendation.

(i)     That Ramon Suazo, a partner at BG Strategic Advisors, founded by Benjamin Gordon and an affiliate of Benjamin Gordon and Mitchell I. Gordon, had prior business dealings with SC&H Capital ("SC&H") and recommended SC&H to Cambridge's board of directors.

(j)     That Cambridge and Parakou were introduced by Mr. Geoffrey Martin, an investment banker who is currently with Morpheus Securities LLC. Mr. Mitchell I. Gordon, Cambridge's President and Chief Financial Officer, was the President of Morpheus Securities LLC prior to joining Cambridge and had maintained relationships with members of such firm. Cambridge and Parakou met for the first time on February 24, 2014, when Benjamin Gordon, Cambridge's Chief Executive Officer, Mr. Gordon, and Ramon Suazo, a partner at BGSA, an affiliate of Benjamin Gordon and Mitchell I. Gordon, held a conference call with Por Liu, Parakou's Chairman and Chief Executive Officer, and Peter S. Bell, Parakou's Chief Commercial Officer, at Parakou's New York offices.

(k)     Benjamin Gordon negotiated the terms of Mitchell Gordon's employment with BGSA and Cambridge substantially concurrently.

(l)     That, in connection with the Parakou Merger Agreement, Cambridge paid to Morpheus Securities LLC a fee of $500,000 (which was entirely contingent on the consummation of the Parakou Merger Agreement) and a fee of $53,000 (which was not contingent upon the consummation of the Parakou Merger Agreement) for introducing Cambridge to Parakou and for assistance in the negotiating process.

48.     Upon information and belief, as a result of this information, shareholders declined to approve the transaction with Parakou resulting in the termination of the Parakou Merger Agreement.

**FIRST CAUSE OF ACTION**

**DIRECT CLASS CLAIM FOR BREACH OF FIDUCIARY DUTIES OF, *INTER ALIA*, GOOD FAITH, LOYALTY, FAIR DEALING, AND DUE CARE**

**(*Against the Individual Defendants*)**

49.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

50.    By reason of the foregoing, the Individual Defendants breached their fiduciary duties of, *inter alia*, good faith, loyalty, fair dealing, and due care to Plaintiff and the Class and/or aided and abetted in the breach of those fiduciary duties.

51.    As a result, Plaintiff and the Class have been damaged.

**SECOND CAUSE OF ACTION**

**DIRECT CLASS CLAIM FOR FAILURE TO DISCLOSE**

**(*Against the Individual Defendants*)**

52.    Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

53.    Under applicable law, the Individual Defendants have a fiduciary obligation to cause Cambridge to completely disclose all material facts in the Proxy Statement so that Cambridge's shareholders can make an informed decision as to whether to vote their shares in favor of the Transactions. As alleged in detail above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material omissions.

54.    As a result of these failures to disclose, Plaintiff and the Class have been damaged.

**THIRD CAUSE OF ACTION**

**DIRECT CLASS CLAIM FOR AIDING AND ABETTING**

**(*Against Ability Computer & Software Industries Ltd.*)**

27

55.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

56.     The Individual Defendants owed Plaintiff and Cambridge's other public shareholders duties of care, loyalty, good faith, fair dealing and disclosure.  As earlier alleged, the Individual Defendants breached these fiduciary duties.  Ability has aided and abetted, and is aiding and abetting, the Individual Defendants in the breaches of their fiduciary duties to the Plaintiff and the Company's other public shareholders by, among other things, (a) negotiating an acquisition of the Company with knowledge of the Individual Defendants' conflicts of interest, (b) insisting on the ability to unfairly influence the outcome of the vote on the Transactions through the ability to purchase shares from shareholders who may be reluctant to vote in favor of the Transactions, (c) insisting on incorporating Holdco in the Cayman Islands and relocating the Company's headquarters to Israel thereby inhibiting shareholders' ability to obtain legal remedies, and (d) requiring consummation of the Transactions to be contingent upon approval of the 2015 Long-Term Incentive Equity Plan, pursuant to which stock options, restricted stocks and deferred stocks will be available for issuance to Holdco's officers and directors (who will primarily be selected by Ability). Further, the Transactions could not take place without the knowing participation of Ability.

57.     As a result of this aiding and abetting, Plaintiff and the Class have been and will be damaged.

**FOURTH CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTIES OF, *INTER ALIA*, GOOD FAITH, LOYALTY, FAIR DEALING, AND DUE CARE**

(*Against the Individual Defendants*)

58.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

59.     By reason of the foregoing, the Individual Defendants breached their fiduciary

28

duties of, *inter alia*, good faith, loyalty, fair dealing, and due care to Cambridge and/or aided and abetted in the breach of those fiduciary duties.

60. As a result, Cambridge has been damaged.

**FIFTH CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR FAILURE TO DISCLOSE**

(***Against the Individual Defendants***)

61. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

62. Under applicable law, the Individual Defendants have a fiduciary obligation to cause Cambridge to disclose all material facts in the Proxy Statement in order that Cambridge's shareholders can make an informed decision as to whether to vote their shares in favor of the merger. As alleged in detail above, the Individual Defendants have breached that fiduciary duty through materially inadequate disclosures and material omissions.

63. As a result, Cambridge has been damaged.

**SIXTH CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR AIDING AND ABETTING**

(***Against Ability***)

64. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

65. By reason of the foregoing, Ability has aided and abetted the Individual Defendants in their breaches of their fiduciary duties of, *inter alia*, good faith, loyalty, fair dealing, and due care to Cambridge.

66. As a result, Cambridge has been damaged.

**SEVENTH CAUSE OF ACTION**

**DIRECT AND DERIVATIVE CLAIM FOR *ULTRA VIRES* ACTS IN VIOLATION OF CAMBRIDGE'S CERTIFICATE OF INCORPORATION**

**(Against the Individual Defendants)**

67.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

68.     As alleged *supra*, Cambridge's amended and restated Certificate of Incorporation provides that Cambridge will continue in existence only until June 23, 2015 (or December 23, 2015 if the Company had executed a definitive agreement to complete a business combination by June 23, 2015, but had not consummated the business combination by June 23, 2015).  As also alleged *supra*, the Parakou Merger Agreement was terminated in May, 2015 and the Ability Merger Agreement was not entered into until September 2015.   Therefore, pursuant to its amended and restated certificate of incorporation, Cambridge was required to liquidate as of June 23, 2015 and redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to an amount then held in the trust account (except for the initial shares and units held by the Individual Defendants (and other initial shareholders) which have no redemption rights). Defendants' efforts to violate Cambridge's amended and restated certificate of incorporation are *ultra vires* acts and therefore void.

69.     By reason of the foregoing, Plaintiff and the Class have been and will be damaged.

**EIGHTH CAUSE OF ACTION**

**CLAIM FOR ATTORNEY'S FEES**

**(Against the Individual Defendants)**

70.     Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

71.     As alleged in detail above, in connection with the Action, the Individual Defendants caused Cambridge to make the Parakou Supplemental Disclosures which resulted in

a benefit being conferred upon Cambridge's shareholders.

72.     As a result, Plaintiff's counsel became entitled to fees under the common benefit doctrine.

**WHEREFORE,** Plaintiff demands judgment as follows:

1.     determining that this action is a proper class action, and that Plaintiff is a proper Class representative;

2.     determining that this action is a proper derivative action;

3.     declaring that the Individual Defendants have breached their fiduciary duties to Plaintiff, the Class and Cambridge;

4.     declaring that the Ability Merger Agreement is void because it is *ultra vires*;

5.     enjoining the Transactions unless and until Defendants comply with their fiduciary duties and, if they are consummated, rescinding them;

6.     awarding Plaintiff, the class and Cambridge compensatory and/or rescissory damages as allowed by law;

7.     awarding interest, attorney's fees, expert fees and other costs, in an amount to be determined; and

8.     granting such other relief as the Court may find just and proper.

Dated: October 15, 2015

**VIANALE & VIANALE LLP**

By: s/ <u>Julie Prag Vianale</u>
Julie Prag Vianale (Fla. Bar No. 184977)
Service email: jvianale@vianalelaw.com
Vianale & Vianale LLP
5550 Glades Road, Suite 500
Boca Raton, Florida 33431
Telephone: (561) 392-4750
Facsimile:  (561) 961-5191

*Counsel for Plaintiff*

**THE BRUALDI LAW FIRM, P.C.**
Richard B. Brualdi (Fla. PHV No. 24304)
29 Broadway, 24th Floor
New York, NY 10006
*Of Counsel*

32

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA

BRIAN LEVY, on Behalf of Himself and All Others )
Similarly Situated, )
                                      ) Case No. 2015CA003339
              Plaintiff, )
                                     ) **Jury Trial Demanded**
        v. )
                                       )
BENJAMIN GORDON, MITCHELL I. GORDON, )
MICHAEL DURHAM, NATHAN GANTCHER, )   **CLASS REPRESENTATION**
SCOTT LAURANS, CAMBRIDGE HOLDCO )
CORP., AND ABILITY COMPUTER & )
SOFTWARE INDUSTRIES LTD. )
              Defendants, )
        and )
                                       )
CAMBRIDGE CAPITAL ACQUISITION CORP. )
                                       )
        Nominal Defendant. )

## VERIFICATION TO FIRST AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

The undersigned hereby declares under penalty of perjury as follows:

1.     That he is Brian Levy.

2.     That he has read the First Amended Class Action and Derivative Complaint in the above entitled action.

3.     That all allegations contained in the Complaint as to Brian Levy and his ownership of shares of Cambridge Capital Acquisition Corp. are true and correct and that he believes the other facts alleged in the Complaint to be true and correct to the best of his knowledge and belief.

_____
Brian Levy

NOT A CERTIFIED COPY